OPINION
{¶ 1} Despina G. Constandinidis appeals from a final judgment and decree of divorce entered by the Greene County Court of Common Pleas, Domestic Relations Division. Constandinidis argues that the trial court erred in its visitation and child support *Page 2 
awards. For the following reasons, the judgment will be affirmed.
 I {¶ 2} Despina Constandinidis is a United States citizen of Palestinian descent. Murwan Owais is a Jordanian national who is legally residing in the United States. Constandinidis and Owais were married on April 6, 2002 in Beavercreek, Ohio. The couple had a daughter, Karam, in October 2003.
 {¶ 3} In September 2005, Owais filed a complaint for divorce. Constandinidis answered and counterclaimed for divorce. Throughout the litigation, Constandinidis maintained that Owais had not established a relationship with Karam prior to the divorce proceeding. Constandinidis repeatedly expressed concern that Owais and his family had threatened to take Karam to Jordan, where she would be raised by Owais's family. (Owais has one brother who resides in the United States, but the rest of his family remains in Jordan.)
 {¶ 4} On January 3, 2006, Owais requested visitation with Karam, which was granted. The visitation occurred at Constandinidis's home, and it was observed by Cindy Hemming, a friend of Constandinidis. Hemming reported that Karam refused to approach her father, refused to hug him or accept his gifts, and indicated that she did not remember him. In February 2006, Constandinidis submitted a report from John D. Kinsel, MS, LPCC, who performs mental health services for young children. Mr. Kinsel recommended that any visitation between Owais and Karam begin as brief (one to two hour) supervised visits. The trial court subsequently ordered Owais to have supervised parenting time one weekend per month for a period of two hours for the first visit, three *Page 3 
hours for the second visit, and four hours for the third visit, with no more than four hours per day.
 {¶ 5} Beginning in April 2006, Owais began residing and working in Columbus, Ohio. In June 2006, Owais requested visitation in accordance with the court's standard order of parenting time. Although a hearing was held, there is no transcript of that hearing in the record. Owais was granted visitation one day per week for one hour. In August 2006, Owais began supervised visitation through the Greene County Family Visitation Center ("GCFVC"). Following an August 31 hearing on visitation before a magistrate, the magistrate granted unsupervised visitation on Sundays from 3:00 to 6:00 p.m. Again, there is no transcript of that hearing in the record. In response to Constandinidis's objections, the trial court modified the order to require the parties to deposit their passports with the Greene County Clerk of Courts before unsupervised parenting time would begin. Since September 2006, Owais has had unsupervised three-hour parenting time with Karam, with transfers occurring at the GCFVC.
 {¶ 6} On March 19, 2007, the court held a final hearing. Owais testified on his own behalf and presented the testimony of Karen Zeker, who conducted the court-ordered home study; and Michelle Box, the manager of the Safe Havens program of the Family Violence Prevention Center of Greene County, who worked with Constandinidis as a victim of domestic violence. Constandinidis also testified on her own behalf and presented the testimony of Hemmig and Abed Awad, an expert on Jordanian family law.
 {¶ 7} On October 2, 2007, the trial court entered a final judgment and decree *Page 4 
of divorce. Constandinidis was designated as the residential parent. Owais was granted parenting time in accordance with the court's standard order as well as extended parenting time during the summer after school was dismissed. Because overnight visitation had not yet occurred, the court ordered that overnight visitation occur on four weekends over eight weeks before following the standard order. The court also ordered a downward deviation in Owais's child support to account for the thirteen weeks that Karam would be with Owais.
 {¶ 8} Constandinidis appeals, raising two assignments of error.
 II {¶ 9} Constandinidis's first assignment of error states:
 {¶ 10} I. "THE TRIAL COURT'S AWARD OF EXTENDED SUMMER VISITATION IS NOT IN THE BEST INTERESTS OF THE MINOR CHILD AND IS UNSUPPORTED BY COMPETENT, CREDIBLE EVIDENCE."
 {¶ 11} In her first assignment of error, Constandinidis claims that the trial court failed to consider the factors set forth in R.C.3109.051(D) when allocating parenting time. She further argues that the trial court's ruling was not based on credible, competent evidence.
 {¶ 12} Constandinidis disputes the following portion of the trial court's judgment:
 {¶ 13} "1. Allocation of Parental Rights — * * * The Court finds the child is three years old and has resided continuously with Defendant since birth. The child has had limited interaction with Plaintiff due to Defendant's unsubstantiated fears of international child abduction and Plaintiff's work schedule. The Plaintiff and the child have gradually become reacquainted with one another through the supervised *Page 5 
visitation center. Supervised visitation was ordered to quash any of the Defendant's unsubstantiated fears that Plaintiff may abduct the child and leave the United States.
 {¶ 14} "The Court ordered a home study and a child custody evaluation to determine the parenting weaknesses and strengths of each party. Both studies found the Plaintiff demonstrated a cooperative attitude toward the supervised visitation and has consistently followed all court orders. Court investigator, Karen Zechar, testified she has no concerns with the Plaintiffs parenting abilities. The Court finds supervised visitation is no longer necessary.
 {¶ 15} "Due to the child's tender years, she is more bonded to the Defendant than the Plaintiff. The Defendant has been the child's primary caregiver since the parties separated. The child has lived in the Greene County area since birth and is enrolled in full time daycare. Both parties are in good health. The Defendant has not technically denied parenting time but has maneuvered to limit it and legally changed the child's name through Probate Court during the divorce proceedings without notifying the Plaintiff or obtaining his consent.
 {¶ 16} "The Plaintiff is a Jordanian national legally residing in the United States. His parents and sibling are living in Jordan. His is current in his child support obligation. A domestic violence petition was filed by the Defendant against the Plaintiff but it was determined to be without merit. Neither party has been convicted of neglect or abuse of a child."
 {¶ 17} "2. Parenting Time — * * *
 {¶ 18} "The extended parenting time is awarded after the Court considers the obstacles to parenting time imposed on the Plaintiff by the unfounded domestic *Page 6 
violence action brought about against him by the Defendant. It also considers the geographic distance between the minor child and the Plaintiff. The Court considers the minor child will have additional available time during the summer to interact with the Plaintiff. It considers the child will soon be four years old and has had time to become reacquainted with the Plaintiff through the Supervised Visitation Center. The child is adjusted to her home and community. The child is a normal, healthy three year old and no credible evidence has been presented to substantiate the Defendant's fears of international abduction. The Court has reviewed the parental evaluation and the home study report. It has no concerns about the child's safety while in the Plaintiff's care. The Court's investigator and the testimony presented supports finding the Plaintiff is a loving and caring parent. Both parties are physically and mentally healthy. Both parents are willing to reschedule parenting time but the Defendant is resistant to anything other than supervised parenting time because of the Plaintiff's nationality. No credible evidence was presented to prove the Plaintiff plans to establish a residence outside of the state.
 {¶ 19} "The Court finds it is in the child's best interest to know both of her parents. The Defendant's irrational fears have compromised the Plaintiff's parenting time and acted as a barrier against the child's normal interaction with her father. * * *"
 {¶ 20} R.C. 3109.051(D) sets forth factors to be considered in granting parenting time. These include the relationship between the parent and child; their geographic proximity and available time; the age, health, and safety of the children; the mental and physical health of all the parties; each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights; whether *Page 7 
either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether the residential parent has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; whether either parent has established a residence or is planning to establish a residence outside this state; and any other factor bearing on the best interest of the child. Id. The trial court must apply the factors and determine the parenting time plan that is in the child's best interest. Braatz v.Braatz (1999), 85 Ohio St.3d 40, 706 N.E.2d 1218. Upon review of the trial court's ruling, it is apparent that the trial court considered each of the relevant factors under R.C. 3109.051(D) in determining what visitation was in Karam's best interest.
 {¶ 21} Constandinidis's primary argument is that the court analysis under R.C. 3109.051(D) is not supported by the record. She states that the judgment failed to recognize that Owais had unsupervised — not supervised — visitation since October 2006. She further states that the prior limited supervised visitation had been based on expert recommendations that Karam needed to be gradually introduced to her father, not based on fears of international abduction. Constandinidis also challenges the trial court's finding that she created obstacles to visitation, such as through the "unfounded" domestic violence petition.
 {¶ 22} At the final hearing, the court heard conflicting versions of Owais's attitude toward his parental responsibilities, the reasons for his limited parenting time before and after the separation, and the likelihood of Karam's abduction to Jordan.
 {¶ 23} Constandinidis's version was consistent with her prior affidavits to the *Page 8 
court. According to Constandinidis, Owais believed that she was infertile and was "extremely upset" when he learned of her pregnancy. When she was approximately five months pregnant, he took a job in Alabama. He returned on the Friday before Karam's birth, which was induced, but left hours after delivery to visit his brother in Minnesota, who was having cosmetic surgery. After Karam's birth, Owais worked in Columbus and lived in an apartment there; Constandinidis lived on and off with her parents until September 2004, when the couple purchased a house. In 2004, Owais also worked in Louisville. Between August 2004 and May 2005, while Owais was taking MBA courses at the University of Dayton, he was very uncomfortable caring for Karam, and Constandinidis's mother began to watch her during the day. Constandinidis denied that her parents' home was unsafe. In the spring of 2005, Owais began to work in Rhode Island. Constandinidis took Karam to see him twice. Shortly after the divorce was filed, Owais moved to North Carolina. He began employment in Columbus, Ohio, in April 2006. Constandinidis stated that she "want[s] very much so for [Karam] to have a relationship with her Dad" and that she tried throughout their marriage to have Owais spend time with Karam, but he was disinterested.
 {¶ 24} Cynthia Hemmig testified that she observed three or four visitations between Owais and Karam. She stated that, during the first visit, Karam was frightened and clung to Constandinidis. Karam did not recognize him and she was not interested in the gifts he brought. Hemming stated that it was obvious that Owais and Karam had not spent much time together. Constandinidis had tried to direct Karam back to Owais, and she did not interfere with the visit. Hemming testified that, during *Page 9 
the second visit, Karam also did not respond to Owais like a father. However, during the third and fourth visits, Karam "kind of warm[ed] up to him." Hemmig stated that Owais did not seem to know age-appropriate limits for Karam. Hemmig acknowledged that she did not know how well the visits had gone over the past ten months. She never heard Constandinidis say negative things about Owais.
 {¶ 25} Constandinidis presented evidence that she complied with the orders of visitation, and she stated that she would like to see a gradual increase in visitation time. However, she thought that overnight visitation would be traumatic. Constandinis believed that overnight visitation could begin when Karam became school-aged. Constandinis denied that she filed a domestic violence petition in an attempt to prevent Karam from spending time with Owais.
 {¶ 26} Constandinis testified that Owais's immigration status is not stable, and Owais had stated that he would prefer their daughter to be raised in a Jordanian environment. Her expert, Abed Awad, testified that Jordanian law would not recognize a custody determination of the Greene County court. He stated that ecclesiastical courts decide issues of custody in Jordan. Custody of a child for child rearing usually goes to the mother, but legal custody of the person and property goes to the father. He opined that there would be very little hope of a mother regaining custody if the child were taken to Jordan.
 {¶ 27} In contrast to Constandinidis's evidence, Owais testified that he was an engaged father and that his work prevented him from being home more with his child. Owais testified that he changed diapers, gave Karam showers, and "did the whole thing." Although Owais traveled as part of his employment, he indicated that he had *Page 10 
lived in Columbus for a year and would not be traveling for work. Owais had concerns about Constandinidis facilitating visitation. He believed Constandinidis was putting Karam in the middle of the divorce.
 {¶ 28} Owais stated that he had never harmed Karam, and he and his family had never threatened to kidnap or abduct her. Owais further denied verbally or emotionally abusing or otherwise violating Constandinidis. He denied stealing things from Constandinidis while blaming her for losing them, putting financial restrictions on her, or destroying/tampering with her property. He stated that he did not have a police record, and that he came from a good, educated family. Owais stated that his brother in the United States is a dentist, and his other brother is a banker. His mother currently has breast cancer and is going through chemotherapy. In contrast, he indicated that Constandinidis's parents were "very violent," there had been several police reports regarding their residence, and there is a history of sexual abuse.
 {¶ 29} Karen Zeker testified that she had conducted a court-ordered home study of Owais in May 2006. She stated that the only outstanding issue that she had with Owais was the question of his green card status. Zeker did not have any concerns about Karam's welfare when she was in her father's care but she had some concerns that Constandinidis would not facilitate visitation. Zeker had observed part of one visit and had not observed any visitation since May 2006.
 {¶ 30} Michelle Box stated that she was a domestic violence advocate who was assisting Constandinidis due to reports of domestic violence against her by Owais. No charges were filed against Owais and no efforts were made to verify the allegations.
 {¶ 31} At the hearing, the trial court also learned that Constandinidis had *Page 11 
changed Karam's legal name to Maysa Constandinidis without Owais's knowledge or consent. Constandinidis stated that she did not know where he lived. She explained that she never wanted to name her daughter Karam, and that she and Owais had had numerous discussions about naming her Maysa. Owais denied that he was "on the run" due to his immigration status, and he stated that Constandinidis could have contacted him through e-mail. Owais was unhappy with the name change.
 {¶ 32} Although the trial court could have credited Constandinidis's version of events and reached a different conclusion from the evidence presented, the trial court did not abuse its discretion in awarding the standard order of visitation with extended summer parenting time. The court apparently credited Owais's testimony that he was an engaged and loving father and rejected Constandinidis's assertion that his early lack of contact with Karam was due to unwillingness to accept parental responsibilities. While there was evidence that Constandinidis did not interfere with visitation, the trial court could have reasonably believed that her interpretation of increasing visitation gradually was extreme and was influenced by her fear of abduction. The court could have reasonably concluded that Karam, who was a normal, healthy, three-year-old, would be able to handle overnight visitation without emotional trauma. The court's findings also reflect that it credited Owais's testimony that he and his family had not threatened abduction and that he intended to reside in Ohio so that he could be close to his daughter. Based on Box's testimony, there was evidence to support the court's conclusion that Constandinidis's claim of domestic violence was unsupported. Although the trial court's ruling suggests that it believed that Owais had supervised visitation, the court had competent, credible evidence to support ordering the standard *Page 12 
order of visitation with extended summer visitation.
 {¶ 33} We note that the trial court addressed Constandinidis's concerns regarding international abduction in its final judgment by ordering the parties to deposit their and Karam's passports with the Greene County Clerk of Courts and stating that "neither parent may take the child outside of the United States without the Court's permission or written notarized consent from the other parent."
 {¶ 34} The first assignment of error is overruled.
 III {¶ 35} Constandinidis's second assignment of error states:
 {¶ 36} II. "THE TRIAL COURT'S ORDER GRANTING APPELLEE A DEVIATION IN THE AMOUNT OF CHILD SUPPORT CONSTITUTES AN ABUSE OF DISCRETION."
 {¶ 37} In her second assignment of error, Constandinidis claims that the trial court erred in granting Owais a downward deviation in his child support obligation due to the extended summer parenting time. She states that she earns less than half of Owais's yearly salary, and that she will incur additional expenses during the summer in order to exercise the standard order of visitation.
 {¶ 38} The court's bases for awarding the downward deviation were set forth as follows:
 {¶ 39} "Pursuant to R.C. 3119.23 the Court finds a child support deviation is warranted due to the additional time that Plaintiff will spend with the minor child during the summer months. The factors listed in R.C. 3109.04(F) have been reviewed. The Court considers the minor child will be with the Plaintiff for thirteen consecutive weeks *Page 13 
during the summer. The child will need summer daycare, additional clothing, toys, food, and recreation. Further, since the child will be spending the summer with the Plaintiff, the Defendant will not be incurring expenses for daycare, clothing, toys, food, and recreation.
 {¶ 40} "Therefore the Court finds a child support deviation is warranted in the downward amount of $2652.48. This amount was arrived at by dividing the Plaintiffs guidelines annual obligation of $10,610.00 per year by 52 weeks and multiplying that figure by the 13 weeks the child will be with the Plaintiff. * * *"
 {¶ 41} Under R.C. 3119.22, the court may order an amount of child support that deviates from the amount of child support that would otherwise result from the use of the basic child support schedule and the applicable worksheet if the court determines that the actual annual obligation would be unjust or inappropriate and would not be in the child's best interest. In making this determination, the court must consider the factors set forth in R.C. 3119.23. Among those factors are extended parenting time and the disparity of income between the parties. The decision to deviate from the actual annual obligation is discretionary and will not be reversed absent an abuse of discretion. See In re Custody of Harris, 168 Ohio App.3d 1, 2006-Ohio-3649,857 N.E.2d 1235, ¶ 60-61.
 {¶ 42} In the present case, the court reasonably reduced Owais's annual child support obligation on the ground that he would be the residential caregiver for thirteen consecutive weeks and would incur significant child-related expenses during that time period. Although Constandinidis will also incur some expenses in traveling to Columbus, Ohio, for standard visitation, her child-related expenses during that time *Page 14 
period will also be significantly reduced, as recognized by the trial court. We cannot say that the trial court abused its discretion in granting a downward deviation of $2,652.48 in Owais's child support obligation.
 {¶ 43} The second assignment of error is overruled.
 IV {¶ 44} The judgment of the trial court will be affirmed.
BROGAN, J. and FAIN, J., concur.
Copies mailed to:
 Peter R. Certo, Jr. Rebekah S. Neuherz Hon. Steven L. Hurley *Page 1