[Cite as *In re C.S.M.*, 2015-Ohio-4608.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

IN THE MATTER OF:   C.S.M.

:
:
:    C.A. CASE NO.   2015-CA-28
:
:    T.C. NO. C44860
:
:    (Civil Appeal from Common
:     Pleas Court, Juvenile Division)
:
:
:
:

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___6th___ day of ____November____, 2015.

. . . . . . . . . .

RICHARD HEMPFLING, Atty. Reg. No. 0029986, 15 West Fourth Street, Suite 100, Dayton, Ohio 45402
      Attorney for Appellant

KEITH KEARNEY, Atty. Reg. No. 003191, 40 N. Main Street, Suite 2160, Dayton, Ohio 45423
      Attorney for Appellee

. . . . . . . . . . . .

FROELICH, P.J.

{¶ 1} Mother appeals from a judgment of the Greene County Court of Common Pleas, Juvenile Division, which determined parental rights and responsibilities, including parenting time and child support, as between Mother and Father. For the following reasons, the judgment will be affirmed with respect to parenting time; it will be reversed on the amount of child support and the monthly arrearage repayment, and remanded for

further consideration of those issues.

**History of the Case**

{¶ 2} C.S.M. was born in December 2012.   Mother and Father were never married and, within months of C.S.M.'s birth, Mother moved with C.S.M. from Beavercreek, Greene County, Ohio to Denver, Colorado.

{¶ 3}  In April 2013, Father filed a motion in the juvenile court to establish custody and visitation, child support, and health care orders related to C.S.M.   Mother filed a motion for child support.   A guardian ad litem was appointed, and a hearing was held before a magistrate in March 2014.

{¶ 4}  In May 2014, the magistrate filed a decision which ordered that: 1) Mother be named the residential parent; 2) Father have visitation with C.S.M. for two weeks every even-numbered month, with additional provisions for holidays and for when the child reaches school-age; 3) Father pay child support in the amount of $760.48 per month, effective the date of his motion; 4) the parents share the travel expenses for visitation equally; and 5) Mother maintain health insurance for the child through her employment. The child support award reflected a downward deviation from the standard order, based on the significant costs of travel for visitation. The magistrate incorporated additional provisions related to the logistics of the visits, uninsured health care expenses, and the like, which are not relevant to this appeal.   Both parties filed objections to the magistrate's decision.

{¶ 5}  In September 2014, while the objections were pending, the parties filed an agreed order, which addressed the dependency tax exemption, notification of flight arrangements, Skype and Facetime contact with the child, and other issues.   A few days

later, the trial court filed a judgment which overruled the parties' objections related to the child support order and shared travel expenses. It added a provision for the payment of the arrearage, which had not been addressed by the magistrate, and made minor modifications or clarifications to the parenting time schedule. The trial court then stated that, "[e]xcept as modified pursuant to this judgment, the Magistrate's Decision is approved as an Order of the Court."

{¶ 6} Mother appealed from the trial court's judgment. She also filed a "Motion to Determine Jurisdiction," suggesting that the trial court's judgment was not a final appealable order in that it "adopted" the magistrate's decision without making its own order incorporating all terms necessary for the parties to determine their rights and obligations. We determined that the judgment was not a final appealable order, and we dismissed the appeal. *In re: C.S.M.*, 2d Dist. Greene No. 2014 CA 45, Decision and Final Judgment Entry (Feb. 19, 2015).

{¶ 7} On April 2, 2015, the trial court issued a comprehensive judgment. Mother filed another notice of appeal. Her brief raises three assignments of error.

**Evidence Presented at the Hearing**

{¶ 8} The parties met through Facebook in December 2011. By Spring 2012, Mother was pregnant, and the parties moved in together.

{¶ 9} According to Father, before the pregnancy, both parties drank alcoholic beverages a few times a week, but not in excess. Once Mother became pregnant, she stopped drinking, but Father did not, which created some friction in the relationship. After they began living together, Father also came to see Mother as "controlling," and felt that Mother treated the relationship and the impending birth of their child as a "business

arrangement." When they had disagreements, Mother threatened Father that she would omit his name from the birth certificate and told him that he had no rights related to the child.

{¶ 10} Father testified that, after C.S.M. was born, the parties had several physical altercations that involved Mother's hitting Father. Mother initiated every physical altercation. He admitted that, in March 2013, he had reacted to Mother's hitting him by pushing her against a wall with his arm to her neck. Mother called the police, but Father left the home before the police arrived. Father was charged with domestic violence, and a protection order was issued.

{¶ 11} According to Father, he inadvertently violated the protection order when he sent a text to Mother asking if they could talk; he was charged with violating the protection order. A police officer corroborated Father's testimony about the basis for the violation at the hearing. A short time after the charges were filed, Mother moved to Colorado with the child; she did not leave any contact information with Father, and she obtained another protection order against him in Colorado.

{¶ 12} Father stated that he had been an active caregiver for his son while the family lived together. Father testified that he wanted to see his son "on a consistent and regular basis," that he and his son were welcome to live with his parents in Beavercreek, and that his parents, who were retired, were willing to assist in caring for C.S.M. while he was at work. His mother also testified to these facts.

{¶ 13} Father's mother further testified that Father had never had a problem with physical altercations in relationships in the past, although he had admitted pushing Mother against a wall on the day police were called to their home. She testified that

Mother had expressed unhappiness with Father's drinking during their relationship, but that Mother had also admitted to being the one who started the physical altercation the day the police were called.

{¶ 14}  Father and Father's mother testified that they had extended family in Ohio with whom they would like C.S.M. to have a relationship, and that Mother's family was also in the area.   Father believed it was in the child's best interest to live closer to all his family.

{¶ 15}  Father denied having a drinking problem and denied any physical abuse of Mother during their relationship, with the exception of the incident where he pushed her against a wall.   He admitted having once been charged with driving under the influence seven or eight years earlier.   He also testified that he had been charged with manslaughter and a weapons offense in South Carolina in 2009 or 2010, but he stated that he had acted in self-defense and that the charges had been dismissed on that basis.

{¶ 16} Mother presented a different picture of the difficulties in her relationship with Father.   She denied being the instigator of their physical fights and stated that she only hit Father in self-defense.   She denied ever having told Father he had no rights to the child.   She also asserted that she only realized how much Father drank after she moved in with him, and that she had seen him drive drunk.   According to Mother, Father did not help with caring for the child, and their fights were often based on her frustration that he did not help.   She also testified that Father had gotten drunk once while caring for the child.   Mother expressed concern about Father's ability to care for the child due to his drinking and anger issues, as evidenced by the alleged domestic violence and by the charges filed against Father in South Carolina.

{¶ 17}   Mother also recounted the incident in which Father pushed her against a wall with his arm during a fight.   Several witnesses, including a police officer, testified that they saw red marks on Mother's neck after this incident.   Mother left for Colorado about four weeks after the domestic violence charges were filed against Father.   She did not tell Father that she was leaving or make any arrangements for him to see the child because she did not think he wanted to see the child.   She also testified that she thought going to Colorado to "hide" was the only way to protect herself and her son, notwithstanding the existence of the protection order.

{¶ 18} Mother's step-father testified that he and his wife planned to move to Colorado – or wherever Mother and C.S.M. lived – when they retired.   He also testified that Father had not been very concerned about C.S.M.'s well-being when the family had been together.

{¶ 19}   At the time of the hearing, Father lived with his parents in Beavercreek and worked at a local shipping company earning $50,000 per year.   Mother worked for the federal government, earning $77,000 per year.   Both parents had the ability to provide health insurance for the child through their employment.

{¶ 20}   The guardian ad litem testified that he had talked with the parties and some of their friends and family in preparing his report and recommendation.   He had had limited time to observe the child, only the day before the hearing, because of the child's residence in Colorado.   The guardian ad litem testified that the child was doing very well with Mother, and that her living arrangements appeared (from pictures) to be very appropriate.   The guardian ad litem testified that, during his investigation, "every party was telling me the same story on Mother's side and it was almost word for word."   The

guardian ad litem recommended that Father be awarded custody of the child so that the child could be in Ohio with the extended family and because Father would foster Mother's relationship with the child.

**The Court's Order**

**{¶ 21}** The trial court named Mother as C.S.M.'s residential and custodial parent. The court provided for parenting time with Father as follows: during even-numbered months, except December, Father has parenting time for two weeks, beginning on the second Sunday of the month; in December of even-numbered years, Father has parenting time for three weeks, including Christmas. Once the child starts kindergarten, the parenting time with Father shifts to accommodate the school schedule, with Father having time with the child during part of Christmas break, all of spring break, and six weeks in the summer. The court ordered that Father be responsible for transportation at the beginning of each parenting time, and Mother be responsible for transportation at the end of each parenting time.

**{¶ 22}** With respect to child support, the court ordered Father to pay $760.48 per month, effective the date of his motion. This amount represented a $3,000 per year downward deviation from the standard order, which the court found was justified due to the "extraordinary costs associated with [Father's] parenting time." The court ordered that Father pay the arrearage (due to the court's order being effective on the date of Father's motion) at a rate of $25 per month.

**Child Support**

**{¶ 23}** Mother's first assignment of error challenges the downward deviation in child support contained in the court's order, because the travel expenses are to be borne

equally by the parties.

{¶ 24} Under R.C. 3119.22, the court may order an amount of child support that deviates from the amount of child support that would otherwise result from the use of the child support guidelines and the applicable worksheet if the court determines that the actual annual obligation would be unjust or inappropriate and would not be in the child's best interest. *Hamby v. Hamby*, 2d Dist. Montgomery No. 26506, 2015-Ohio-1042, ¶ 16, citing *Owais v. Costandinidis,* 2d Dist. Greene No. 2007 CA 89, 2008-Ohio-1615, ¶ 41. In making this determination, the court must consider the factors set forth in R.C. 3119.23, which include "extended parenting time or extraordinary costs associated with parenting time" by the obligor. R.C. 3119.23(D). "If the court enters a child support order that deviates from the calculated amount, 'the court must enter in the journal the amount of child support calculated pursuant to the basic child support schedule and the applicable worksheet, through the line establishing the actual annual obligation, its determination that that amount would be unjust or inappropriate and would not be in the best interest of the child, and findings of fact supporting that determination.' " *In re S.H.*, 2d Dist. Montgomery No. 23382, 2009-Ohio-6592, ¶ 46, quoting R.C. 3119.22. *See also Marker v. Grimm*, 65 Ohio St.3d 139, 143, 601 N.E.2d 496 (1992) (holding that any court-ordered deviation from the applicable worksheet and the basic child support schedule must include findings of fact to support the determination); *Lenoir v. Paschal*, 2d Dist. Montgomery No. 23732, 2010-Ohio-2922, ¶ 8 (finding the trial court abused its discretion in not following the statutorily mandated procedure, which required making all necessary findings to support the deviation).

{¶ 25} "The decision to deviate from the actual annual obligation is discretionary

and will not be reversed absent an abuse of discretion." *Hamby* at ¶ 16, quoting *Owais* at ¶ 41; *Qi v. Yang,* 2d Dist. Greene No. 2012-CA-24, 2012-Ohio-5542, ¶ 14. An abuse of discretion implies an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 26}** The court cited the "extraordinary costs" associated with Father's parenting time, which is one of the enumerated factors that a court may consider in granting a deviation from the child support guidelines. R.C. 3119.23(D). In its original judgment entry, the trial court also observed that Mother "unilaterally decided to move to Colorado," and observed that "[w]hy there was the need for a physical separation of several hundred miles was never explained."

**{¶ 27}** The parenting schedule provides for the child to make six visits per year to Ohio from Colorado for a total of 12 or 13 weeks. We could speculate that assuming the child comes to Ohio so that Father can work during these periods, such a trip would require airfare, probably for the child *and* an accompanying adult, for each visit, or a lengthy drive that would necessitate taking time off of work. The court's decision that these costs approximated $3,000 may have been a reasonable estimation. However, no evidence was offered by either party as to the approximate costs or the likely manner of such trips. Moreover, the child support calculation already reflected Mother's higher income, and the parents were to bear the travel expenses equally.

**{¶ 28}** The trial court did not provide any specific explanation or "findings of fact" as to why the standard child support order was unjust or inappropriate or why it was in the child's best interest to award a downward deviation in Father's child support based

on the travel expenses. Although the trial court might be able to articulate a reasonable basis for this deviation based on the evidence before it, it has not satisfied its obligation to do so. The court erred in failing to make the findings required by R.C. 3119.22 to justify the deviation.

{¶ 29} The first assignment of error is sustained insofar as the trial court did not make the required findings supporting its award of a downward deviation in child support.

**Arrearage Repayment**

{¶ 30} In her second assignment of error, Mother claims that the trial court's order that Father repay the child support arrearage at a rate of $25 per month was unreasonably low because, at that rate, it would take more than 40 years for the arrearage to be repaid. She also claims that, during the period reflected by the arrearage (approximately 18 months), during which no visitation occurred, Father should not have received the offset for travel expenses.

{¶ 31} Mother asserts that the low repayment rate of the arrearage was arbitrary and unreasonable. Father did not specifically respond to this argument.

{¶ 32} R.C. 3123.21(A) provides that "an order to collect * * * any arrearage owed by the obligor under a support order * * * shall be rebuttably presumed to provide that the arrearage amount collected with each payment of current support equal at least twenty per cent of the current support payment." A trial court may deviate from this presumption based on the circumstances of a particular situation. R.C. 3123.21(B).

{¶ 33} In this case, the magistrate did not address the arrearage at all, and the trial court set the arrearage payment at $25 per month, without explanation. Twenty per cent of Father's support payment would be approximately $150 per month. It does not

appear from the record that an arrearage repayment rate significantly lower than the statutory presumption was warranted by the parties' circumstances, and we agree with Mother that the arrearage payment does not recoup the amount owed within a reasonable period of time. As such, we conclude that the trial court abused its discretion in setting the arrearage repayment rate. We will remand for the trial court to reconsider this amount and for it to expressly state the total amount of arrearage that is to be repaid.

{¶ 34} Although the stated reason for the downward deviation in Father's child support was the travel expenses involved in visiting with the child, the trial court reasonably concluded that Mother was not entitled to more child support during the period in which Father was denied contact with the child.

{¶ 35} The second assignment of error is sustained in part and overruled in part.

**Parenting Time**

{¶ 36} In her third assignment of error, Mother argues that the trial court abused its discretion in determining the parenting time schedule. Specifically, Mother expresses concern about the frequency and duration of Father's parenting time, after he "had virtually no contact or interaction with C.S.M." for approximately one year; she suggests that a "gradual phase-in of overnight visits" was more appropriate.

{¶ 37} Mother moved with the child to Colorado, without telling Father or providing him with contact information. Once she was there, she obtained a protection order which prohibited Father from contacting her. The parties disputed the circumstances that led to her move and whether the protection orders were warranted, but the trial court found that Father's account of these events was more credible than Mother's. Father further testified that, although Mother had offered for him to visit in Colorado, he was not

comfortable to travel there without other family members, in light of Mother's past accusations against him; the cost of traveling with family members and Father's uncertainty about whether Mother would actually permit him to visit with the child when he arrived prevented him from making such a trip.

**{¶ 38}** Based on the trial court's assessment of the witnesses' credibility, the court reasonably concluded that the absence of visitation with the child during the first year after Mother's move to Colorado should not prevent or delay any future visits with Father. We do not find the visitation schedule adopted by the trial court to be "unconscionable," as Mother suggests. Moreover, the trial court could have reasonably concluded that the "gradual phase-in of overnight visits" suggested by Mother was unfeasible, considering the significant travel involved in each visit.

**{¶ 39}** The third assignment of error is overruled.

**{¶ 40}** The judgment of the trial court will be reversed with respect to the deviation from the child support guidelines. On remand, the trial court must make the findings necessary to support such a deviation, if it finds that such factors are present, or its order of child support must conform to the child support guidelines. The trial court's judgment is also reversed with respect to the arrearage payments, and this matter will be remanded for further consideration. In all other respects, the judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

Richard Hempfling
Keith Kearney

Hon. Adolfo Tornichio