**In re CUSTODY OF HARRIS.**

[Cite as *In re Custody of Harris,* 168 Ohio App.3d 1, 2006-Ohio-3649.]

Court of Appeals of Ohio,
Second District, Champaign County.

Nos. 2005–CA–42 and 2005–CA–43.

Decided July 14, 2006.

2

Darrell L. Heckman, for appellant and cross-appellee, Shanee Stevens.

Cheryl R. Washington, for appellee and cross-appellant, Kesalon Harris.

BROGAN, Judge.

{¶ 1} This case involves an appeal and cross-appeal from juvenile court orders regarding custody and child support for Lena, Keshee, and Kesalon Harris. The natural mother, Shanee Stevens, is the appellant, and presents the following assignments of error:

{¶ 2} "I. The trial court erred in ordering insufficient child support to Appellant because it credited Appellee with improper tax deductions from his tax return in computing his income.

{¶ 3} "II. The trial court erred by ordering insufficient child support by failing to base Appellee's income in part on his taxable corporate income.

{¶ 4} "III. The trial court erred by ordering insufficient child support by failing to base Appellee's income on money actually earned rather than money actually reported on his tax returns.

{¶ 5} "IV. The trial court erred in failing to consider special needs of Keshee Harris in determining the proper level of child support."

{¶ 6} The natural father, Kesalon Harris Sr., is the cross-appellant, and raises the following assignments of error:

{¶ 7} "I. The trial court erred in awarding sole custody of the minor children to Plaintiff Shanee Stevens.

{¶ 8} "II. The trial court erred in the calculation of Mr. Harris' income."

{¶ 9} After considering the assignments of error and applicable law, we find that appellant's first, second, and third assignments of error should be sustained, and that the fourth assignment of error should be overruled. Further, appellee's cross-assignments of error lack merit and should be overruled. Accordingly, the judgment of the trial court is reversed in part and affirmed in part, and the cause is remanded for further proceedings.

I

{¶ 10} Due to the circumstances of this case, we will consider the cross-assignment of error relating to custody first. We have mentioned before the "recurring and regrettable tragedy" in our society when children are used as "pawns in a war between divorced and embittered parents." *Bell v. Bell* (June 5, 1998), Clark App. No. 97–CA–105, 1998 WL 288945, *1. Although the parties in the present case have never been married, their children are nonetheless being traumatized by their parents' inability to cooperate. In *Bell,* we stressed:

{¶ 11} " 'Truly, such a war has no victors and the ultimate casualties are the children, who stand to suffer deeply and permanently unless their parents can learn to control their hostility and anger towards each other. We have previously emphasized, and stress once again, that children have certain rights, including "the right to love each parent, without feeling guilt, pressure, or rejection; the right not to choose sides; the right to have a positive and constructive on-going relationship with each parent; and most important * * * the right to not participate in the painful games parents play to hurt each other or to be put in the middle of their battles." ' " Id., quoting *Thomas v. Freeland* (Oct. 10, 1997), Greene App. No. 97–CA–06, 1997 WL 624331, quoting Ohio CLE Institute, Vol. No. 96–06, 1996 Family Law Update Reference Manual, Children and Divorce: A Guide for Parents.

{¶ 12} Before addressing the details, we should point out that Mr. Harris is the primary individual choosing to participate in painful games. As will be apparent, Harris inappropriately involved his children in custody matters.

{¶ 13} In the first cross-assignment of error, Harris claims that the trial court abused its discretion in awarding sole custody to Stevens. The factors allegedly supporting this contention are Stevens's lack of proper child care for the children, improper discipline methods, significant mental and/or emotional problems, mood swings, lack of honesty, and endangerment of the children by driving without a license and taking the children around a convicted criminal who was in jail for threatening both Mr. Harris and Ms. Stevens. In addition, Harris contends that Stevens purposely kept the children from seeing him. These claims are unsupported by the record, or rely on distortions of fact, or were rejected by the magistrate and trial court as non-issues.

{¶ 14} In reviewing custody decisions, we have noted:

{¶ 15} "Trial court judgments on allocation of parental rights and responsibilities cannot be reversed absent an abuse of discretion. * * * Abuse of discretion means more than just an error of law or of judgment. Instead, 'it implies that the court's attitude is unreasonable, arbitrary or unconscionable.' *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 16} "Furthermore, where competent, credible evidence supports a custody award, there is no abuse of discretion." *Chirico v. Chirico,* Montgomery App. No. 19722, 2003-Ohio-3238, 2003 WL 21419242, at ¶ 9–10.

{¶ 17} The magistrate's custody decision in the present case was filed on October 29, 2004, and included specific findings on the factors in R.C. 3109.04(F)(1)(a) through (j). Among other things, the magistrate found that Mr. Harris had attempted to influence the children, that the daughters had both expressed a preference for Stevens to be the primary custodial parent, and that Stevens's parenting skills were good, with the exception of her conduct in taking the children to visit an ex-boyfriend who was in jail and then lying in court about it. The magistrate also noted that the parents had minimal ability to cooperate, that their relationship was damaged, and that perceptible animosity existed.

{¶ 18} Additionally, the magistrate found that Harris had not made timely support payments and had chosen to have little contact with the children over the past six months. The magistrate further observed that while the guardian ad litem report of February 23, 2004, had recommended shared parenting, Harris had reduced his involvement in his children's lives since the report. Finally, the magistrate remarked that Stevens had been the primary caretaker throughout the parties' relationship. Accordingly, the magistrate felt that Stevens should have custody of the children and that Harris should receive standard visitation rights, in the hope that Harris would begin spending more time with the children.

{¶ 19} After Harris filed objections to the magistrate's decision, the trial court sustained one objection, but found it was not determinative. The objection in question related to the finding that Harris had attempted to influence the children. The trial court overruled the rest of the objections, and agreed that Stevens should be the custodial parent.

{¶ 20} We agree with the trial court that Stevens should receive custody. However, we disagree with the trial court's finding that Harris did not attempt to influence the children. This part of the court's decision does not appear to be based on sound reasoning. Specifically, the record indicates that Harris punished his daughters by refusing to see them after they testified that they wanted their mother to be the custodial parent. In fact, conduct such as Harris's is the reason we have stressed that children should not be used as pawns by parents.

{¶ 21} The evidence, including in camera interviews with the children, indicates that Harris was not involved with his children in a very meaningful way before the parties separated. At an in camera hearing on March 24, 2004, one daughter (Lena) stated that the children never got to see Harris when they lived with him except on Sundays, and even then, he was either watching sports or sleeping. Lena also said Harris did not generally attend school functions or gymnastics

meets, and that he had only begun to spend time with them in the past five months, when he and Stevens were fighting over custody. The younger daughter, Keshee (who was nine), testified that Harris did not attend gymnastics meets, even when he was told about them. Both girls expressed a desire to have Stevens as the primary custodial parent. After hearing this evidence, the magistrate awarded temporary custody to Stevens, subject to standard parenting time for Harris.

{¶ 22} As we mentioned, a guardian ad litem had previously reported on February 23, 2004, that Harris been spending a good bit of time with the children. However, this drastically changed after the March 24, 2004 hearing. On May 3, 2004, Stevens testified that there had been a significant decrease in Harris's interaction with his daughters. The girls had tried to contact their father, but he had not called them at all. He had also not attempted to set up visitation. Harris had told Keshee that he did not know why she bothered to call after what she had said in court. Harris also told Lena that she had betrayed him and had lied in court. Both girls were very upset by his comments.

{¶ 23} In September 2004, the magistrate again interviewed the daughters in camera. At that time, Lena said she was sad because she had not seen her father in a long time. Lena said Harris never answered the phone when she called and that she had probably called him twice every day. In this regard, Lena said, "He probably doesn't call me back because I said that last time I wanted to stay with my mom." The record contains ample evidence about comments by Harris that would have made his daughter feel that way, including a statement that he paid a lot for his children and if they did not want to live with him, he should not have to pay for them.

{¶ 24} Keshee also testified in September 2004 that the children had not visited with Harris much. She felt this might be because Harris was mad or was a little upset about the last hearing.

{¶ 25} In view of the above testimony, we have no idea why the trial court concluded that Harris did not attempt to influence the children. The girls did say on March 24, 2004 (at the temporary custody hearing), that neither parent had tried to influence them. However, the record after that hearing contains substantial evidence of attempts by Harris to manipulate his daughters about the custody issue.

{¶ 26} This factor alone could have justified awarding custody to Stevens, since a child's best interest is not served by being treated as a pawn. Furthermore, Harris's choice not to see his daughters was punitive and was clearly not in their best interests. In custody disputes between parents, the universal rule is that the child's best interests prevail. *In re Perales* (1977), 52 Ohio St.2d 89, 96,

6 O.O.3d 293, 369 N.E.2d 1047, fn. 8. See, also, *Derrit v. Derrit*, 163 Ohio App.3d 52, 2005-Ohio-4777, 836 N.E.2d 39, at ¶ 64, citing *Gardini v. Moyer* (1991), 61 Ohio St.3d 479, 483, 575 N.E.2d 423 ("When resolving a child-custody dispute, the best-interest-of-the-child standard guides the trial court").

{¶ 27} Also pertinent are the facts that Harris was held in contempt twice for failing to pay support and that a substantial arrearage in child support existed. See R.C. 3109.04(F)(1)(g) (which notes that one factor in determining a child's best interests is whether the parent has paid support as required and whether an arrearage exists). Harris claimed that he could not afford to pay the support that was ordered, but the magistrate did not find his testimony credible. We agree with that assessment.

{¶ 28} Accordingly, the trial court did not abuse its discretion in awarding sole custody of the minor children to Shanee Stevens. The first cross-assignment of error is, therefore, overruled.

II

{¶ 29} Harris's remaining cross assignment, as well as Shanee's assignments of error all deal with support calculations. As a result, these matters will be addressed together.

{¶ 30} Support decisions are reviewed for abuse of discretion. *Booth v. Booth* (1989), 44 Ohio St.3d 142, 144, 541 N.E.2d 1028. Again, this means that the trial court's attitude was arbitrary, unreasonable, or unconscionable. *Chirico*, 2003-Ohio-3238, at ¶ 9, citing *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. Decisions are unreasonable, however, if they are not supported by a sound reasoning process. See, e.g., *Jackson v. Jackson* (2000), 137 Ohio App.3d 782, 799, 739 N.E.2d 1203, citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597.

{¶ 31} As we mentioned, the magistrate found that Harris was not credible when he testified about his lack of income. Harris was the sole owner of a trucking company (Kes Harris Trucking, L.L.C.) that grossed over 1.6 million dollars in 2002. Harris also started an excavating company (B.K. Excavating) in 2003, which would reputedly have had a loss for the year 2003. However, Harris failed to provide any documentation regarding B.K. Excavating, nor did he provide any documentation for Kes Harris Trucking, other than the company's 2002 Federal tax return, which showed net income of $57,395 for 2002.

{¶ 32} Harris paid himself only $900 per week as an owner and driver for the trucking business. He claimed that the business was seasonal and that he was therefore required to be laid off from around the last week of December until

June every year. During this time, Harris collected $400 per week in unemployment benefits. Curiously, Harris was the only truck driver in the company who was laid off; the other truck drivers continued to drive during the year.

{¶ 33} The evidence also indicated that the trucking company employed ten to 12 people and owned 12 or 14 large trucks, ranging from tandems, which had beds about 16 feet long, to semi-trucks, with beds 24 to 36 feet long. The company's business included highway work, city work, and work for various contractors, hauling asphalt, gravel, dirt, and miscellaneous items.

{¶ 34} Notably, Mr. Harris had poor recollection when discussing his assets, both personal and business. Among other things, he could not recall how much he owed on his mortgage or whether he had any equity in his home. He could not recall the highest amount he had had in his personal checking account in the two months before one of the hearings, and could not even recall the amount of his wages that were reported on a W–2 that he had recently received.

{¶ 35} Stevens had an associate's degree in accounting and did bookkeeping for the company between 1999 and December 2003. As we mentioned, the 2002 tax return for Harris Trucking was submitted, and showed net income of about $57,395. Stevens testified in detail about various discrepancies between the actual expenses of the company and those used in the 2002 tax return. Her testimony and the lack of documentation raise questions about whether the $57,395 profit figure, as well as other years' profits, was a significant underreporting. Stevens's testimony was not completely credible on all points, due to her own conviction for a theft when she worked for another company. However, the lack of documentation, and the less than credible testimony of Harris and Harris's corporate attorney raise serious doubts about the corporate income figures that were provided.

{¶ 36} After hearing testimony, the magistrate filed a temporary support order on April 6, 2004, requiring Harris to pay total monthly support of $1,530.52 for the three children and $303.34 per month on the arrearage, plus processing fees. In calculating Harris's income, the magistrate included $900 per week of employment income, $7,200 in unemployment income, and $57,395 in net profits. The magistrate then issued a final decision on support on October 29, 2004, using the same figures and awarding the same amount of monthly child support. Harris filed objections to this decision.

{¶ 37} At various points in this case, the magistrate indicated that Harris needed to provide accurate information so that his income could be verified. For example, at a hearing in January 2004, the magistrate expressed concern about Harris's failure to account for income, such as income that should have resulted from business-equipment depreciation. At that time, the magistrate said that an accountant might need to be involved to trace the numbers. In a decision issued

on October 29, 2004, the magistrate again questioned why Harris had not submitted documentation to support his claims about his income. Subsequently, on March 3, 2005, the magistrate found Harris in contempt for failing to pay child support. In this decision, the magistrate once again commented on the fact that Harris had not submitted documentation to support his claims.

{¶ 38} On May 6, 2005, the trial court filed an entry indicating that it had reviewed the hearing transcripts and was of the opinion that the court could not rely on the financial information Harris had supplied. Consequently, the court scheduled an attorney's conference to inform counsel of how the court intended to proceed, and to get the attorneys' input. After the conference, the court filed an entry on May 25, 2005, stating that it had encouraged the parties to reach agreement. Failing that, the court could employ, at Mr. Harris's expense, an expert to evaluate the two companies Harris owned. The court also noted that it did not feel that the financial information supplied in the hearings before the magistrate could be relied on as accurate.

{¶ 39} On June 13, 2005, the trial court filed an order on support matters. In the order, the court noted that Harris had not provided proper income documentation. The court mentioned the problem the magistrate had encountered in obtaining information from Harris and stressed that Harris's reported income figures were very difficult to believe. The court said that Harris should consider three options: (1) accepting the magistrate's support calculations, (2) depositing $1,500 with the court so that the court could engage an independent expert to evaluate Harris's businesses and personal income, or (3) if neither the first nor the second option were acceptable, the court could, without further inquiry, approve the magistrate's decision because of Harris's failure to cooperate. The court then gave counsel until June 27, 2005, to respond in writing.

{¶ 40} Harris never responded to the court. Inexplicably, instead of adhering to the options outlined, the trial court filed an order on July 13, 2005, modifying the support order. The court acknowledged that the magistrate's frustration was understandable. However, the court felt that the magistrate should not have used the company's taxable income as a constructive dividend. The court discussed a few accounting principles and then said that the appropriate approach would be to credit Harris with the company's net income, as recorded in its books, that was added to the company's unappropriated retained earnings. Accordingly, the court used a figure of $17,597 instead of the $57,395 that the magistrate had added. This lowered the child support to $1,155.06 per month for all three children.

{¶ 41} As we mentioned, both parties appealed from this decision. Stevens claims that the trial court erred by crediting Harris with improper deductions on the corporate tax return, by failing to base Harris's income on the corporation's

taxable income, and by failing to base Harris's income on money actually earned rather than money reported on his tax returns. In contrast, Harris claims that the trial court erred in finding that he was voluntarily underemployed and by adding $17,579 in unappropriated retained earnings to his income because those earnings were not addressed at all in any testimony. In addition, Harris believes that the court should have awarded him the tax exemption for the minor children.

{¶ 42} After reviewing the matter, we find that the trial court's reduction of child support was unreasonable, because it was not supported by a sound reasoning process. *Jackson*, 137 Ohio App.3d 782, 799, 739 N.E.2d 1203. In this regard, the trial court had originally decided either to appoint an expert or to accept the magistrate's calculations. The basis for this decision was Harris's failure to provide appropriate income documentation. However, without any response from Harris, and without receiving any further information, the court entered an order lowering support.

{¶ 43} "Income" for purposes of calculating support means either:

{¶ 44} "(a) For a parent who is employed to full capacity, the gross income of the parent;

{¶ 45} "(b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent." R.C. 3119.01(C)(5).

{¶ 46} The trial court found that Harris was voluntarily underemployed because of his practice of laying himself off for half a year. As a result, the court imputed income of $900 per week, year-round, to Harris. We agree with that finding, particularly in light of Harris's lack of credibility on income matters and the fact that other drivers for the company were not laid off during the year. Therefore, the court was justified in adding Harris's potential income to his gross income, for purposes of calculating child support.

{¶ 47} According to R.C. 3119.01(C)(7), gross income includes "the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable * * *. * * * Gross income also includes * * * self-generated income; and potential cash flow from any source."

{¶ 48} "Self-generated income" is defined by R.C. 3119.01(C)(13) as "gross receipts received by a parent from self-employment, proprietorship of a business, joint ownership of a partnership or closely held corporation, and rents minus ordinary and necessary expenses incurred by the parent in generating the gross receipts. 'Self-generated income' includes expense reimbursements or in-kind payments received by a parent from self-employment, the operation of a business, or rents, including company cars, free housing, reimbursed meals, and other benefits, if the reimbursements are significant and reduce personal living expenses."

{¶ 49} As simply one type of in-kind payment that is involved in the present case, but was not accounted for in the trial court, are company cars Harris used, including a $47,000 Lincoln Navigator and a 2000 Escalade, that were paid for by the company. In *Offenberg v. Offenberg,* Cuyahoga App. Nos. 78885, 78886, 79425, and 79426, 2003-Ohio-269, 2003 WL 152814, the court noted:

{¶ 50} "[B]lind reliance on a corporate tax return for the income figure is an impermissible way to determine such income because it does not allow the judge to evaluate the possible manipulation of the numbers contained on the return to conceal income which, as a practical matter, may be available for child support purposes. Put another way, legitimate business expenses for income tax purposes may also be personal benefits for a parent, freeing up other income for possible child support distribution. 'In computing income for purposes of child support, a court should pay particular attention to the possibility that a spouse who is the sole shareholder of a business is engaged in "creative accounting" designed to cloak net income. Therefore, the court needs to consider all financial data which relates to the operation of that spouse's business. * * * The failure to do so has been found to constitute an abuse of discretion.'" Id. at ¶ 30, quoting *Corrigan v. Corrigan* (May 13, 1999), Cuyahoga App. Nos. 74088 and 74094, 1999 WL 304523, 1999 WL 304523.

{¶ 51} R.C. 3119.01(C)(9)(a) further provides that ordinary and business expenses incurred in generating cash receipts includes actual cash items the parent or business expends. It also includes depreciation of business equipment, but "does not include depreciation expenses and other noncash items that are allowed as deductions on any federal tax return of the parent or the parent's business." R.C. 3119.01(C)(9)(b). These other types of depreciation deductions are excluded so that " 'a parent's gross income is not reduced by any sum that was not actually expended in the year used for computing child support.' *Baus v. Baus* (1991), 72 Ohio App.3d 781, 784, 596 N.E.2d 509." *Foster v. Foster,* 150 Ohio App.3d 298, 2002-Ohio-6390, 780 N.E.2d 1041, at ¶ 19. "Absent evidence that the depreciation deduction represents actual cash expenses incurred in the year that the deduction was taken, R.C. 3119.01(C)(9) mandates that the depreciation deduction be included in the parent's gross income for that year." Id. at ¶ 23.

{¶ 52} At one of the hearings, the magistrate noted that $187,739 in depreciation was listed on the tax return. However, no documentation was ever submitted to indicate that this amount represented actual cash items expended incurred in the year the depreciation deduction was taken, nor was there any documentation that the expenses themselves were actually incurred. As a result, these items may have been required to be included in gross income. The significance of this is that Harris's gross income might have been much higher than even the $57,395 net-profit figure that the magistrate included.

12

{¶ 53} "When determining a parent's income for purposes of calculating child support, the trial court must verify the income 'with suitable documents, including, but not limited to, paystubs, employer statements, receipts and expense vouchers related to self-generated income, tax returns, and all supporting documentation and schedules for the tax returns.'" *Foster*, 2002-Ohio-6390, ¶ 12, quoting R.C. 3119.05.

{¶ 54} The point we are making is that the trial court used a correct approach in requiring Harris either to produce records and submit to an expert evaluation of his businesses or to accept the income figures the magistrate used. As we have indicated, Harris's gross income was likely higher than what the magistrate calculated. In abandoning this approach and in failing to properly verify income, the trial court abused its discretion. Accordingly, Stevens's first, second, and third assignments of error are sustained. This cause is remanded to the trial court for proper verification of Harris's business and personal income, with the understanding that if Harris does not produce documentation that will allow an expert to trace his income, the court will be justified in concluding that his income is at least the amount the magistrate found. Furthermore, even though we are remanding the cause, the support order currently in effect will not be vacated, since the recalculated support on remand will be considerably higher.

{¶ 55} We do not find any abuse of discretion in the decision to award the tax exemptions to Stevens. "The decision to allocate tax exemptions is a matter left to the discretion of the trial court. * * *. R.C. 3119.82 requires the trial court to consider any 'relevant factor concerning the best interest of the children' in making such a decision." *Flynn v. Sender*, Cuyahoga App. No. 84406, 2004-Ohio-6283, 2004 WL 2676742, ¶ 33, quoting *Singer v. Dickinson* (1992), 63 Ohio St.3d 408, 588 N.E.2d 806.

{¶ 56} Regarding tax exemptions, the trial court began by commenting on the general assumption that awarding tax exemptions to custodial parents is in the children's best interests. The trial court then focused on the questionable nature of Harris's income figures and the lack of any evidence that the children would be benefitted if Harris received the exemptions. Since these findings are supported by the record, the court's decision was clearly not arbitrary, capricious, or unreasonable.

{¶ 57} The final assignment of error deals with the trial court's failure to deviate from the child-support-computation worksheet for special circumstances associated with gymnastic fees for Keshee. According to the testimony, Keshee showed unusual promise in gymnastics. Fees for her lessons and participation in meets amounted to about $600 per year. Neither the trial court nor the magistrate took these fees into consideration in ordering support.

{¶ 58} Under R.C. 3119.22:

{¶ 59} "The court may order an amount of child support that deviates from the amount of child support that would otherwise result from the use of the basic child support schedule and the applicable worksheet, through the line establishing the actual annual obligation, if, after considering the factors and criteria set forth in section 3119.23 of the Revised Code, the court determines that the amount calculated pursuant to the basic child support schedule and the applicable worksheet, through the line establishing the actual annual obligation, would be unjust or inappropriate and would not be in the best interest of the child."

{¶ 60} Among the factors in R.C. 3119.23 are the children's special and unusual needs. However, " 'the fact that a child has both talent for and an interest in an avocation which could eventually benefit career pursuits does not require the expense for that avocation be included as a element of reasonable support.' " *Donaldson v. Donaldson* (Jan. 30, 1997), Franklin App. No. 96APF06–766, 1997 WL 35539, 1997 WL 35539, *6, quoting *Howard v. Reeck* (Ind.App.1982), 439 N.E.2d 727, 730. In deciding whether to deviate from the basic support schedule, courts may also consider whether a parent has paid "in-kind" contributions like direct payments for lessons. See R.C. 3119.23(J). However, ordering a deviation is not mandatory; instead, R.C. 3119.22 says that a court *"may* order an amount of child support that deviates." (Emphasis added.) This is clearly discretionary. See, e.g., *Coleman v. Campbell*, Geauga App. No. 2001–G–2401, 2002-Ohio-3841, 2002 WL 1750877, at ¶ 16 (stating that a trial court does not abuse its discretion in refusing to deviate, because deviation is not required. Thus, the party requesting a deviation has the burden of showing that the court's decision was an abuse of discretion).

{¶ 61} In the present case, the yearly gymnastics expenses were not that significant. While parents should encourage their children's talents and interests, we cannot say that the trial court abused its discretion in failing to order an upward deviation in support. Consequently, the fourth assignment of error is without merit and is overruled.

{¶ 62} Based on the preceding discussion, the first, second, and third assignments of error are sustained. The fourth assignment of error as well as both cross-assignments are overruled. Accordingly, the judgment is affirmed in part and reversed in part, and the cause is remanded for further proceedings.

Judgment affirmed in part
and reversed in part,
and cause remanded.

FAIN and DONOVAN, JJ., concur.