[Cite as *Peterson v. McAfee*, 2019-Ohio-731.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| ANDREW PETERSON | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28138 |
| | : | |
| v. | : | Trial Court Case No. 2013-DR-993 |
| | : | |
| JULIE MCAFEE, fka PETERSON | : | (Domestic Relations Appeal) |
| | : | |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 1st day of March, 2019.

. . . . . . . . . . .

MICHAEL R. ECKHART, Atty. Reg. No. 0031450, 5335 Far Hills Avenue, #109, Dayton, Ohio 45429
        Attorney for Plaintiff-Appellant

MICHAEL SHEETS, Atty. Reg. No. 0052043, 1331 Woodman Drive, Dayton, Ohio 45432
        Attorney for Defendant-Appellee

. . . . . . . . . . . .

WELBAUM, P.J.

**{¶ 1}** Andrew Peterson appeals from a judgment finding him in contempt and awarding attorney fees to his ex-wife, Julie McAfee.[1]  According to Andrew, the trial court incorrectly interpreted Paragraph 17 of the Montgomery County, Ohio Standard Order of Parenting Time ("Standard Order") when it required him to be responsible for taking the parties' children to extracurricular activities during his parenting time.  Andrew contends that he has priority over setting activities that would occur during his parenting time, even if they conflict with activities that Julie previously set.

**{¶ 2}** For the reasons discussed below, we find no error in the trial court's interpretation of the Standard Order, and the court did not abuse its discretion by holding Andrew in contempt.  Accordingly, the judgment of the trial court will be affirmed.

## I.  Facts and Course of Proceedings

**{¶ 3}** Unfortunately, the parties in this case cannot cooperate in even the most minimal fashion, which has led to many opposing motions for contempt over the past several years.  The history of the case is as follows.

**{¶ 4}** In September 2013, Andrew filed a complaint for divorce.  According to the complaint, the parties were married in 2006, and four children were born during the marriage: J.P., L.P., A.P., and M.P. (three sons and a daughter, who were six, five, three, and one and a half years old, respectively, when the complaint was filed).  During the marriage, Andrew was employed as a technical writer, and Julie primarily cared for the children.  Julie operated a photography business, but earned minimal income.

---

[1] For convenience and clarity, we will refer to the parties by their first names.

{¶ 5} In October 2013, the court ordered that Julie would have temporary custody of the children, and Andrew would have parenting time in accordance with the court's Standard Order. The Order, *which never changed during the course of the litigation*, provided in Paragraph 17 as follows:

17. **EXTRACURRICULAR ACTIVITIES:** Regardless of where the children are living, their continued participation in extracurricular activities, school related or otherwise, should not be interrupted. It is the responsibility of the parent with whom the children are residing at the time to discuss the scheduling of such activities with the children and to provide transportation to the activities. Each parent shall provide the other parent with notice of all extracurricular activities, complete with schedules and the name, address and telephone of the activity leader, if available.

Standard Order of Parenting Time, Montgomery County Domestic Relations Court, p. 2, attached to Doc. #24 (Temporary Order).

{¶ 6} Despite the parties' modest assets, the final divorce decree was not filed until February 2016. The delay appears to have been caused mostly by changes of counsel for both sides and time spent resolving contempt motions and requests for family investigations.

{¶ 7} Under the divorce decree, Julie was designated the residential parent and legal custodian, and Andrew was to have parenting time pursuant to the court's Standard Order, except that mid-week parenting was scheduled from 5:00 p.m. to 8:00 p.m. until the children were older. The decree further provided, in pertinent part, that:

Both parents shall have equal access [to] the children's extra curricular,

school and sports records.   In the event that Father does not have access, Mother will provide Father with 72 hours['] notice of all of the children's sport and extra curricular activities.   *Both parents are responsible to transport the children to all of their activities during their parenting time.*

(Emphasis added.)   Doc. #109, p. 3 (Final Judgment and Decree of Divorce).   The court's Standard Order was also attached to the divorce decree.

{¶ 8} No appeals were taken from the final decree.   Shortly thereafter, the round of contempt motions began.   On April 22, 2016, Julie filed a contempt motion alleging, among other things, that Andrew refused to take the children to their extracurricular activities as agreed in the divorce decree.   Andrew then filed a contempt motion on May 10, 2016, asking the court, among other things, to "clarify and compel Defendant to not set extracurricular activities for the kids over and above normal activities during Plaintiff's parenting time."   Doc. #130, p. 1.

{¶ 9} During the proceedings, the parties filed numerous motions, many of which were for contempt.   A few motions sought ex parte orders.   Six motions were filed between April and December 2016.   The trial court held a hearing on the pending motions on January 11, 2017.   The following day, an Agreed Order was filed.   Among other things, the parties agreed that they would "follow the Guardian Ad Litem's recommendation and engage in a psychological/parenting evaluation and counseling to improve their parenting."   Doc. #161, p. 1 (Agreed Order).   The parties further agreed that they would sign up for and use "OurFamilyWizard.com" ("Wizard") for communication.   According to the agreement, Julie "shall use this website to provide to [Andrew] details of the children's extracurricular activities as soon as the information

becomes available." *Id.* at p. 2.

{¶ 10} In pertinent part, the Agreed Order also stated that:

3. [Andrew] shall be entitled to participate in children's school activities and events as allowed by the school.

4. *[Andrew] shall ensure the children attend all their activities.* If the children are double-booked, the parties shall work together to get them to their activities.

5*. [Andrew] is contempt for not taking the children to their activities. He is sentenced to 10 days in jail. Said sentence is suspended on the condition that he takes the children to their activities in the future.* * * * The contempt finding may be purged by [Andrew's] participating in the counseling as outlined above for six months.

[Julie] is in contempt for interfering with [Andrew's] parenting time. She is sentenced to 10 days in jail. Said sentence is suspended on condition that she not interfere with [Andrew's] parenting time in the future. * * * The contempt finding may be purged by [Julie's] participating in the counseling as outlined above for six months.

(Emphasis added.) Agreed Order at p. 2.

{¶ 11} As part of the Agreed Order, the parties waived their right to a decision and permanent order of the magistrate. The order was also labeled as a final appealable order, but neither side filed a notice of appeal.

{¶ 12} On March 2, 2017, Andrew filed another motion for contempt against Julie, alleging, among other things, that she had denied him parenting time and had interfered

with extracurricular activities. At the hearing, which was held in early April 2017, the evidence indicated that Julie had withheld visitation from Andrew after the weekend of January 20, 2017, when he refused to take the children to their soccer games. Julie's stated reason for withholding visitation was that even though the parties had just entered into an agreed order, Andrew refused to take the children to their activities the very first weekend of parenting that followed the filing of the Agreed Order.

{¶ 13} Julie did not sign into Wizard until February 2017 and did not list any activities for the January 20, 2017 weekend, although she did send an email and text about the planned activities to Andrew on January 19, 2017. She also gave Andrew a written note about the children's activities and practices on January 20, 2017, when he picked up the children. However, Andrew did not take the children to any of their sports activities that weekend. His position was that he did not need to take them because he had not been given 72 hours' notice as the divorce decree required. He also said he had planned a holiday party with his family.

{¶ 14} Andrew further testified at the April 2017 hearing that the children's extracurricular activities were "aspirational and not mandatory" and that "if something's not mandatory, I didn't understand how the previous ruling by Magistrate Reno in January held me in contempt for not taking them to something that wasn't mandatory." Transcript of April 7, 2017 Proceedings, p. 42.

{¶ 15} At the end of this hearing, the following exchange occurred:

The Court: I'm going to note for the record that that January order was an agreed entry that you signed, sir.

The Witness: Yes, ma'am.

The Court:   So you agreed to hold yourself in contempt —

The Witness:   Yes, ma'am.

The Court:   – for that.

*Id.* at pp. 42-43.

{¶ 16} The magistrate then addressed both parties, and stressed to Julie that she could not engage in self-help and deny parenting time because Andrew was not taking the children to their activities; instead, her remedy was to file a contempt motion.   In addition, the magistrate emphasized to Andrew that he was required to get the children to their activities.   *Id.* at pp. 43-44.

{¶ 17} On June 8, 2017, the magistrate filed a decision finding Julie in contempt for interfering with Andrew's parenting time, for failing to post activities on Wizard, and for failing to follow up with counseling.   The magistrate sentenced Julie to 20 days in jail and suspended the sentence on the condition that she provide Andrew with three weeks of her 2017 summer parenting time, not interfere with his parenting time in the future, and post all the children's activities on Wizard within five days of the magistrate's decision.

{¶ 18} In the decision, the magistrate also commented that:

> Since the Agreed Order was filed, Julie interfered with Andrew's parenting time and Andrew failed to take the children to their activities; thereby each violated the terms of their suspended sentence.   *Andrew is not relieved of the obligation to take the children to their activities if Julie fails to give the 72 hour notice.*

(Emphasis added.)   Doc. #174, p. 3, fn. 1 (Magistrate Decision).   No contempt order was made against Andrew because Julie had not filed a motion for contempt.   Julie filed

objections to the magistrate's decision, but they were overruled in October 2017.

{¶ 19} On June 9, 2017, Julie filed a motion for an ex parte order requiring Andrew to take the children to their extracurricular activities during his upcoming weeks of parenting time. In the motion, Julie contended that Andrew had repeatedly refused to take the children to their activities over the last several months, which resulted in Julie having to make a four-hour round-trip drive to take them to their activities when Andrew had parenting time. The motion further alleged that Andrew had "recently reiterated his stance that this Court's Standard Order of Parenting Time DOES NOT require him to take the children to their activities, and that case law supports his position that Julie is required to provide all transportation for extracurricular activities." Doc. #175, p. 2.

{¶ 20} On June 13, 2017, the magistrate held a hearing on this motion; both parties and their attorneys were present. The magistrate then filed a decision on June 16, 2017, noting as follows:

Andrew testified that children's activities are aspirational, citing *Daufel v. Daufel*, 2008-Ohio-3868, 2nd District Court of Appeals. *As discussed in the June 8, 2017 Magistrate Decision, Andrew committed to ensuring the children attend their activities and he testified that if Julie provided him with the information, he would get the children to their activities.*

Andrew also believes he is not responsible for transportation. Under the Standard Order of Parenting Time, Andrew is responsible for the transportation for this parenting time and is required to get the children to their activities. This does not mean that Andrew has to personally do this

during his work hours. But if Julie sets activities during Andrew's work hours, he can ask Julie to transport the children. Andrew has to ensure the children get to their activities.

(Emphasis added.) Doc. #181, p. 4 (Magistrate Decision).

**{¶ 21}** The magistrate, therefore, held that Julie's motion for an ex parte order was well-taken in part and ordered that Andrew "shall ensure the children participate in their activities." *Id.* at p. 6. Andrew did not file objections to the magistrate's decision, and on February 28, 2018, the trial court adopted the order since no objections had been filed. The court also adopted the order nunc pro tunc to July 16, 2017. No appeal was taken from that judgment.

**{¶ 22}** About a month after the magistrate's June 16, 2017 decision, Julie filed a 12-branch motion, which included requests that Andrew be held in contempt for violating orders regarding extracurricular activities and for his refusal to transport the children, both to activities and to school and/or appointments. The motion noted 24 instances between April 12, 2017 and July 13, 2017, when Andrew allegedly failed to take the children to their activities, and seven instances from April 17, 2017 to July 7, 2017, when he allegedly failed to take the children to appointments and/or school.

**{¶ 23}** The first hearing on this motion was held on August 31, 2017, and the second hearing was held on October 12, 2017. Because testimony had not yet concluded, a third hearing was scheduled for December 6, 2017. This hearing was continued at Andrew's request to January 23, 2018, and testimony was finished on that date.

**{¶ 24}** In the meantime, Julie filed a motion for an ex parte order on October 19,

2017, asking the court to order that Andrew take the children to activities during his parenting time.   In the motion and in an affidavit attached to the motion, Julie contended that Andrew failed to take the children to any of their scheduled activities between May 24, 2017 and October 16, 2017, and that the children had missed tryouts, tournaments, games, and practices on 19 weekend days and on every Wednesday night during this time period.   According to the motion, the most recent failure had occurred during the past weekend, when Andrew failed to take the children to any of their activities.   *See* Doc. #225.

**{¶ 25}** A hearing was scheduled on the motion for October 26, 2017, but in the interim, the Judge filed an ex parte order requiring Andrew to take the parties' minor children to all activities during his upcoming parenting time that were posted on Wizard and were scheduled outside his work hours.   The order further provided that if Andrew "failed to transport the children to their activities as Ordered, his parenting time will be suspended from that point forward on any dates that the children have scheduled events." Doc. #227, p. 1 (Ex Parte Order).

**{¶ 26}** On October 27, 2017, the magistrate filed a decision following a hearing on the ex parte motion and order filed on October 19, 2017.   The decision ordered that the ex parte order remain in effect, and stated that:

> The Ex Parte Motion concerns Andrew's continued failure to take the children to activities that Julie scheduled.   Andrew testified that he understood that he was not required to take the children to these activities. Instead, Andrew "discusses" with the children the activities and the result of that discussion is that Andrew and the children do other family activities and

that the children miss the scheduled activities.   Andrew is mistaken that the discussion with the children mentioned in the Standard Order of Parenting Time allows a conclusion that the children do not have to attend the scheduled activities if they choose not to attend.   Andrew is to take the children to the activities scheduled by Julie as long as Andrew is not working (several counseling sessions are during the day when Andrew is at work – Julie is to take the children to these activities if Andrew cannot).

Doc. #231, p. 5 (Magistrate Decision).

{¶ 27} The magistrate further noted that Andrew had asked for clarification of the second paragraph of the ex parte order, which had suspended his parenting time.   In this regard, the magistrate stated that:

Hopefully, Andrew now understands his responsibilities with regard to taking the children to scheduled events.   But if Andrew fails to take the children to their scheduled events as ordered, thereafter, if a child has a scheduled event during his parenting time, he will forfeit his parenting time for the day of the event.   For Wednesday events, Andrew will not pick up any child with an event.   For Friday events, Andrew will not pick up a child with any event until Saturday morning at 9 a.m.   For Saturday or Sunday or weekday events during holiday parenting time, the parties shall exchange any child with the event that day at least two hours before the first event with Julie picking them up from Andrew.   The next morning at 9:00 a.m., Andrew may pick the child/children up to complete his parenting time. * * *

If any child has events two or more days in a row, Andrew will not

pick up that child until the morning after the final event at 9:00 a.m.   If the day after the event is a school day, Andrew will not pick up that child. * * *

Doc. #231 at pp. 6-7.

{¶ 28} Andrew filed objections to the magistrate's decision, but the trial court overruled his objections on January 26, 2018.   The court made the following comments, among others:

The Court disagrees with Andrew that the Standard Order of Parenting Time allows the children to determine which activities they wish to attend.   In fact, the Standard Order states: 'Regardless of where the children are living, their continued participation in extracurricular activities, school related or otherwise, should not be interrupted.   It is the responsibility of the parent with whom the children are residing at the time to discuss the scheduling of such activities with the children and to provide transportation to the activities.'   Nowhere does it state that the children are to decide which activities they will attend.   The *scheduling* shall be discussed and transportation *shall* be provided by the parent with whom the children are staying."

(Emphasis sic.)   Doc. #250, pp. 3-4 (Decision and Judgment).

{¶ 29} The court, therefore, ordered that the ex parte order would remain in effect using the clarification contained in the magistrate's decision.   The judgment was labeled as a final appealable order, but Andrew did not to file a notice of appeal.

{¶ 30} In the meantime, Andrew had filed another motion for contempt on December 12, 2017, contending that Julie had interfered with his parenting time on

October 25, 2017. This motion was set for hearing on January 23, 2018, which was also the final hearing day for Julie's July 2017 contempt motion.

{¶ 31} After hearing testimony on January 23, 2018, the magistrate filed a decision in late March 2018, finding Andrew in contempt for failing to take the children to their activities (Branches I and II of Julie's contempt motion). Andrew was sentenced to 20 days in jail, with the sentence suspended on the condition that he follow court orders concerning getting the children to their activities. With respect to Andrew's motion for contempt, the magistrate found that Julie did not interfere with visitation intentionally, as she made an error that she immediately tried to correct. However, Andrew failed to respond to Julie concerning her attempt to correct. The magistrate did find Julie in contempt for timely failing to pay prior attorney fees and costs that had been awarded to Andrew. Andrew was awarded $350 in attorney fees, and payment of that amount within 60 days would purge the contempt.

{¶ 32} Andrew filed objections to the magistrate's decision in April 2018, but Julie did not file objections. On August 27, 2018, the trial court found that Andrew's objections were not well-taken and that there was sufficient evidence to support the finding of contempt. As a result, the court found Andrew in contempt for failing to take the children to their activities after they were posted on Wizard. The court sentenced Andrew to 20 days in jail, with the time suspended on the condition that he follow the court's orders about getting the children to their activities. The court again stressed that the order of transportation was "not aspirational. It is mandatory." Doc. # 273, p. 5. (Decision and Judgment).

{¶ 33} Andrew now appeals from the judgment entered on August 27, 2018.

## II. Interpretation of Parenting Order

**{¶ 34}** Andrew's First Assignment of error states that:

The Trial Court Erred and Abused Its Discretion in Its Interpretation of Section 17 of the Montgomery County, Ohio Standard Order of Parenting Time.

**{¶ 35}** Under this assignment of error, Andrew contends that the language in Paragraph 17 of the Standard Order allows him to take the children to activities he has set even if their mother has previously set an activity during his parenting time. The language he relies on says that: "It shall be the responsibility of the parent with whom the children are residing at the time to discuss the scheduling of such activities with the children and to provide transportation to the activities."

**{¶ 36}** According to Andrew, this phrase, with no further explanation, is too vague to impose a duty on him to transport the children to activities that Julie sets. In addition, Andrew argues that he should not be held in contempt due to the order's lack of clarity. In this regard, Andrew points to the fact that branch five of his motion to show cause, which was filed on December 7, 2017, asked for modification or clarification of this phrase.

**{¶ 37}** "The law is well-established that 'a court may enforce its own orders, including divorce decrees.' " *Barton v. Barton*, 2017-Ohio-980, 86 N.E.3d 937, ¶ 75 (2d Dist.), quoting *Stocker v. Stocker*, 9th Dist. Wayne No. 12CA0021, 2012-Ohio-5821, ¶ 30. "Under Civ.R. 75(I), the continuing jurisdiction of a court that issues a domestic relations decree 'may be invoked by the filing of any motion by a party.' " *State ex rel. Soukup v. Celebrezze*, 83 Ohio St.3d 549, 551, 700 N.E.2d 1278 (1998), quoting *Blake v. Heistan*,

99 Ohio App.3d 84, 87, 649 N.E.2d 1304 (3d Dist.1994). "A postdecree show-cause motion filed by a party invokes both the inherent power of a domestic relations court to enforce its own orders and the court's continuing jurisdiction under Civ.R. 75(I)." *Id.*

{¶ 38} "Contempt is defined in general terms as disobedience of a court order." *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 554, 740 N.E.2d 265 (2001). "The power of contempt is inherent in a court, such power being necessary to the exercise of judicial functions." *Denovchek v. Bd. of Trumbull Cty. Commrs.*, 36 Ohio St.3d 14, 15, 520 N.E.2d 1362 (1988).

{¶ 39} "Civil contempt sanctions are designed for remedial or coercive purposes and are often employed to compel obedience to a court order." *Corn* at 554. "Criminal contempt, on the other hand, is usually characterized by an unconditional prison sentence or fine. * * * Its sanctions are punitive in nature, designed to vindicate the authority of the court." *Denovchek* at 16. "Thus, civil contempts are characterized as violations against the party for whose benefit the order was made, whereas criminal contempts are most often described as offenses against the dignity or process of the court." *Corn* at 555. *Accord Barton* at ¶ 97.

{¶ 40} Contempt orders are reviewed for abuse of discretion, which means that the trial court must have acted unreasonably, arbitrarily, or unconscionably. *State ex rel. Cincinnati Enquirer v. Hunter*, 138 Ohio St.3d 51, 2013-Ohio-5614, 3 N.E.3d 179, ¶ 21. This standard of review is "highly deferential," and "we will not lightly substitute our interpretation for that of the issuing court." *Id.* at ¶ 29.

{¶ 41} After reviewing the record, we conclude that Andrew's arguments are without merit. The divorce decree, filed in February 2016, specifically states that "[b]oth

parents are responsible to transport the children to all of their activities during their parenting time." Doc. #108 at p. 3. This provision clearly requires each parent to transport the children to the children's activities during the parenting time of that particular parent. The decree makes no exceptions.

{¶ 42} Furthermore, the Standard Order, including Paragraph 17, was in effect from the time the court's temporary orders were entered in October 2013. The Standard Order was also attached to the final divorce decree. Andrew was clearly required to transport the children if they had activities scheduled during his parenting time and there is no tenable argument that these provisions were ambiguous. If Andrew was confused about the meaning of this provision, he could have appealed from the divorce decree. However, he did not. For the following two years, he also insisted, during different hearings and through ever-evolving changes of position, that he was confused about his responsibilities.

{¶ 43} Andrew's testimony at the contempt hearing reveals that he was well aware of his position before the divorce decree was filed. As support for his refusal to transport, Andrew has repeatedly asserted that children's activities are "aspirational," not "mandatory." This assertion is taken from *Daufel v. Daufel*, 2d Dist. Montgomery No. 22584, 2008-Ohio-3868, and was cited by Andrew in the trial court.

{¶ 44} According to Andrew's testimony at the contempt hearing, he had found the *Daufel* case and its "aspirational not mandatory" language within three to four months after he filed for divorce. January 23, 2018 Transcript of Proceedings ("Tr."), Vol. III., pp. 290-291. Since the divorce was filed in September 2013, Andrew was aware of *Daufel* by January 2014, at the latest. However, even though the final decree was not filed for

two more years, Andrew never raised this point with the court. In fact, Andrew testified during the contempt hearing that his original attorney disagreed with him about the aspirational aspect, and Andrew's desire to request "clarification" was one of the reasons that his attorney asked to withdraw from representation. *Id.* at p. 291. Notably, the attorney was granted leave to withdraw in July 2014. *See* Doc. #69. Again, while the withdrawal took place about 19 months before the final decree was filed, Andrew never brought the issue to the trial court's attention thereafter, nor did he seek "clarification."

{¶ 45} These points are not mentioned for the purpose of applying the doctrine of res judicata, under which " '[a] valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action.' " *Kelm v. Kelm*, 92 Ohio St.3d 223, 227, 749 N.E.2d 299 (2001), quoting *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 653 N.E.2d 226 (1995), syllabus. In *Kelm*, the court held that res judicata should not be strictly applied in the area of custody and visitation because trial courts are allowed to modify the allocation of custody and visitation rights. *Id.* The court stressed that because custody and visitation orders are never final, "we sacrifice finality and some of our limited judicial resources in order to secure a higher value - the best interests of children." *Id.*

{¶ 46} Although we do not apply res judicata, Andrew's awareness of the "aspirational" issue and his failure to raise it before his divorce belies his assertion that he was confused by the meaning of Paragraph 17 of the Standard Order – or indeed, by any of the court's orders.

{¶ 47} Turning now to *Daufel*, we note that the parties in that case had filed

numerous post-decree motions against each other. This caused the magistrate to comment that the children unfortunately had " 'parents that engage in a contentious battle of post-decree motions and do not place at the forefront what is in the best interest of these young children.' " *Daufel*, 2d Dist. Montgomery No. 22584, 2008-Ohio-3868, at ¶ 3. The same observation applies here.

{¶ 48} "We have mentioned before the 'recurring and regrettable tragedy' in our society when children are used as 'pawns in a war between divorced and embittered parents.' " *In re Custody of Harris*, 168 Ohio App.3d 1, 2006-Ohio-3649, 857 N.E.2d 1235, ¶ 10 (2d Dist.), quoting *Bell v. Bell*, 2d Dist. Clark No. 97-CA-105, 1998 WL 288945, *1 (June 5, 1998). As we stressed in *Harris*:

> " 'Truly, such a war has no victors and the ultimate casualties are the children, who stand to suffer deeply and permanently unless their parents can learn to control their hostility and anger towards each other. We have previously emphasized, and stress once again, that children have certain rights, including "the right to love each parent, without feeling guilt, pressure, or rejection; the right not to choose sides; the right to have a positive and constructive on-going relationship with each parent; and most important * * * the right to not participate in the painful games parents play to hurt each other or to be put in the middle of their battles." ' "

*Harris* at ¶ 11, quoting *Bell* at *1. (Other citations omitted.)

{¶ 49} The parties in *Daufel* both apparently lived in Dayton, Ohio, but the father worked in Wilmington, Ohio. During his summer parenting time, he placed the children in daycare in Wilmington, which interfered with a "complex" set of activities mother had

arranged in the Dayton area, where her daycare was located. *Daufel* at ¶ 16. The trial court held that it would be in the children's best interest for the parties to maintain separate daycare due to the father's location and the parents' "lack of communication to coordinate the use of the [Mother's] daycare." *Id.* at ¶ 17. Consequently, the court let the father use his daycare, which made it physically impossible for the children to attend all their extracurricular activities. *Id.*

{¶ 50} The mother subsequently appealed, arguing that the trial court's order violated Loc.R. 4.34 of the Court of Common Pleas of Montgomery County, Domestic Relations Division by allowing interruptions to the extracurricular activities she had arranged. *Id.* at ¶ 19. We disagreed with the mother, stating that we viewed "the goals of the provision of the Local Rule to be aspirational, not mandatory." *Id.* We also noted that "the court found that, due to [the father's] work schedule, a modification of the provision of its Standard Parenting Time order is warranted, an exception that the local rule expressly permits." *Id.*

{¶ 51} Loc.R. 4.34 states that:

Unless the parties otherwise agree or the facts of a case warrant a modification thereof (e.g. long distance travel or non-traditional work schedules) the court will adopt the Standard Order of Parenting Time for all cases before the court pursuant to R.C. 3109.051(F)(2). All parenting time orders shall contain paragraphs 18, 19 and 20 of the Standard Order of Parenting Time. [*See* Appendix, Form 4]

{¶ 52} Loc.R. 4.34 requires trial courts to adopt the Standard Order (which is in the Appendix, and includes Paragraph 17), unless the parties agree otherwise or a case's

facts require modification. The only provisions the Standard Order must include are Paragraphs 18-20, which refer to matters like out-of-state relocation, access to records, and notice of change of address. Consistent with Loc.R. 4.34, the trial court in *Daufel* modified the parenting order to let the father keep the children in daycare near his work, even though it might interfere to some extent with the children's activities.

**{¶ 53}** The aspirational reference in *Daufel* appears to be to the fact that children's activities should not be interrupted, although this is not entirely clear, because the court only referenced the goals of the "rule," which is Loc.R. 4.34, and not the Standard Order itself. The word "should" is the past tense of "shall," and is defined as "to express obligation, propriety, or expediency."[2]

**{¶ 54}** Use of the word "shall" is construed as mandatory for purposes of construing rules or statutes "unless other language evidences a clear and unequivocal intent to the contrary." *State ex rel. Cincinnati Enquirer v. Lyons*, 140 Ohio St.3d 7, 2014-Ohio-2354, 14 N.E.3d 989, ¶ 28. The only language in Loc.R. 4.34 indicating intent other than a mandatory application concerns the ability to modify the Standard Order under appropriate circumstances. We correctly noted in *Daufel* that modification was expressly allowed. *Daufel*, 2d Dist. Montgomery No. 22584, 2008-Ohio-3868, at ¶ 19.

**{¶ 55}** Paragraph 17 is "aspirational" from the standpoint that parents should cooperate with each other, and situations obviously may arise where a child's scheduled activities may have to be interrupted for legitimate reasons. In that case, modification may be allowed, as we said in *Daufel*. However, the appropriate procedure would be to seek prior permission from the court, rather than making unilateral decisions. Such

---

[2] *See* www.merriam-webster.com/dictionary/should (accessed February 13, 2019).

decisions would be particularly inappropriate where the court has repeatedly told a parent that the children must be taken to their activities.

{¶ 56} Andrew also cites *Harleman v. Harleman*, 2d Dist. Montgomery No. 24704, 2012-Ohio-205, in which we said that Paragraph 17 of the Standard Order "affords both parents the right to enroll children in extracurricular activities, preferably in consultation with one another." *Id.* at ¶ 14. In *Harleman*, the non-custodial parent enrolled his son in a "tee-ball" program at one YMCA, and the mother refused to allow the son to play, even though the YMCA was willing to let him play only on the days he was with his father. The mother also later removed the son from a "tee-ball" program sponsored by a different YMCA. After the father filed a contempt motion for interference with visitation, the mother filed a contempt motion against the father for attempting registration against her wishes. *Id.* at ¶ 4-5. After the trial court denied her motion, the mother appealed. Our comment about both parents having the right to enroll a child in activities occurred in that context.

{¶ 57} However, that was not the issue here. In fact, Andrew enrolled the boys in fencing, and there was no indication that Julie had refused to transport them during her parenting time. The issue in this case was whether Andrew should be held in contempt for his continuous refusal to transport his children to activities that Julie scheduled, when some of those activities (like soccer practices or games) occurred during Andrew's parenting time. As we have noted, Andrew took different positions in the trial court, including that Julie was required to transport the children for any activities taking place during his parenting time;[3] that the children could decide if they wanted to attend activities

---

[3] Despite the plain language requiring Andrew to transport the children, Andrew took this

because activities were aspirational not mandatory; and that, if he had to transport the children, he had the right to disregard any activity that fell during his parenting time, unless it happened to be something he had scheduled.

{¶ 58} During testimony at the contempt hearing, Andrew was confronted with the report of a guardian ad litem ("GAL") that was issued in June 2016. He then read part of the report to the court. In the report, the GAL said that:

> Andrew stated on several times to this Guardian that children's activities are aspirational and not mandatory. * * * Referenced Court opinion Daufel v. Daufel, Case Number 2002DR1943, and Court of Appeals Case Number CA22584.
>
> * * *
>
> It is clear to this Guardian Andrew has no intentions [of] taking the children to their activities. As a matter of fact, Andrew told this Guardian that he has not taken the children to their extra curricular activities in the last two years.

Tr., Vol. III, at pp. 288-289.

{¶ 59} At the contempt hearing, Andrew claimed the GAL's statement was inaccurate because he (Andrew) had taken the children to activities that he set up; he just did not take them to activities that his ex-wife set up. *Id.* at 290.

{¶ 60} As noted, Julie filed a contempt motion in April 2016, based on Andrew's refusal to take the children to scheduled activities. This was followed by Andrew's May 2016 motion asking the court to "clarify and compel Defendant to not set extracurricular

position based on a very convoluted (and incorrect) reading of the Standard Order.

activities for the kids over and above normal activities during Plaintiff's parenting time." Doc. #130 at p. 1. The GAL's report then followed in June 2016.

{¶ 61} In January 2017, the parties resolved these and all other pending motions with an *agreed order*. Among other things, the order stated that "[Andrew] *shall ensure the children attend all their activities*. If the children are double-booked, the parties shall work together to get them to their activities." (Emphasis added.) Doc. #161 at p. 2 (Agreed Order). This is consistent with our statement in *Harleman* that Paragraph 17 of the Standard Order "affords both parents the right to enroll children in extracurricular activities, preferably in consultation with one another." *Harleman*, 2d Dist. Montgomery No. 24704, 2012-Ohio-205, at ¶ 14.

{¶ 62} As the magistrate noted, Andrew also agreed to have himself held in contempt for failing to transport the children. *Id.* The 10-day jail sentence was suspended on the condition that Andrew "take the children to their activities in the future." *Id.* However, Andrew did not comply with the agreed order that he had signed, resulting in many more court filings, motions for contempt, and evidentiary hearings.

{¶ 63} In view of these facts, it is apparent that Andrew continually defied court orders, even when the court explicitly told him what he needed to do. Whether Paragraph 17 is described as aspirational or mandatory is, therefore, irrelevant in the context of this case. Andrew's duty to transport the children to their activities always existed and was not ambiguous. Furthermore, when the trial court said the Standard Order was mandatory, not aspirational, it was not alluding to the fact that the children's activities were mandatory; the court's statement was that the Standard Order of Parenting "requires that transportation shall be provided by the parent with whom the children are

staying." Doc. #273 at p. 5.

**{¶ 64}** In *Daufel*, the trial court made an exception to the requirement that the children's activities should not be interrupted, by letting the father keep the children in daycare near his work. *Daufel*, 2d Dist. Montgomery No. 22584, 2008-Ohio-3868, at ¶ 18. Our opinion did not mean that a court's standard orders are not mandatory and do not have to be followed by the parties. As we said, the appropriate procedure is to apply for a modification and ask the court for a deviation based on the kinds of factors mentioned in Loc.R. 4.34. Andrew did file a motion in May 2016, asking the court to "clarify and compel Defendant to not set extracurricular activities for the kids over and above normal activities during Plaintiff's parenting time." Doc. #130 at p. 1. That motion and others were resolved by an agreed order, which made it clear that Andrew was to transport the children to their activities. He chose not to comply, and his claim that he failed to understand the agreed order and other court orders was simply not credible.

**{¶ 65}** While the judgment currently on appeal does also say that the activities of the custodial parent take precedence, this statement must be assessed in the context of the case's history, which includes nearly five years of a parent repeatedly refusing to abide by court orders. In this regard, the trial court specifically said that "[t]his court does not agree with Andrew that *Daufel v. Daufel*, 2008-Ohio-3686 (2nd Dist. Ct of App., 2008) is dispositive to this case. Andrew has consistently refused to acknowledge the court's orders to take the children to their extracurricular activities." Doc. #273 at p. 7. The court further stated that:

> There is no question that Andrew is free to enroll the children in
> activities of his own. However, when the activities he has chosen interfere

with those which Julie, the custodial parent of the children, has chosen, the activities scheduled by the custodial parent should take precedence. Without this court's interference, both parents should be cognizant of the stress and strain the double booking of activities puts on the minor children and be considerate of the *children's* schedules.

Both parents *shall* post all scheduled activities on OurFamilyWizard *as soon as the dates become available.* Then both parents, presumably being vigilant and considerate to *their* children, will be aware of conflicting times and/or locations. If the activity is scheduled during Andrew's parenting time, he shall transport the children to all activities as humanly possible, regardless of which parent enrolled the child in the activity. If not humanly possible, Andrew shall ask Julie for assistance in transporting the children on OurFamilyWizard.

(Emphasis sic.) Doc. #273 at p. 6.

{¶ 66} In the case before us, the parties have unfortunately chosen to live in separate cities (Centerville and Springfield), and most of the children's activities, like soccer, are scheduled where the children spend the majority of their time. Julie testified that if the children expressed interest in an activity, she would enroll them. She further said she did not control when practices were scheduled and did not specifically set up activities that would interfere with Andrew's time. The trial court's decision was reasonable in view of the parties' inability to cooperate with each other and Andrew's inexplicable refusal to obey court orders.

{¶ 67} Based on the preceding discussion, we find no error in the trial court's

interpretation of Paragraph 17 of the Standard Order. Accordingly, the First Assignment of Error is overruled.

## IV. Finding of Contempt on Branches I, II, and XII

{¶ 68} Andrew's Second Assignment of Error states that:

The Trial Court Erred and Abused Its Discretion in Upholding the Magistrate's Finding of Contempt on Appellee's Original Contempt Motion Branches I, II, and XII.

{¶ 69} Under this assignment of error, Andrew contends that the trial court erred by finding him in contempt. His argument is again based on his claim that the children's activities were aspirational, not mandatory, that he was confused about court rulings, and so forth. For the reasons previously discussed, we disagree. The original divorce decree was explicit in requiring both parents to transport the children during their parenting time, and the Standard Order was not ambiguous.

{¶ 70} Andrew also contends that Julie should not have been awarded attorney fees under Branch XII in view of the required proof needed for a contempt finding. Again, we disagree. The finding of contempt was well-supported by clear and convincing evidence, which is the standard of proof for civil contempt. *See, e.g.*, *Jenkins v. Jenkins*, 2012-Ohio-4182, 975 N.E.2d 1060, ¶ 12 (2d Dist.).

{¶ 71} If a party is found in contempt of court for failing to comply with orders granting parenting rights, the court must award reasonable attorney fees to the adverse party. R.C. 3109.051(K). "We have held that evidence of the actual amount owed or paid or its reasonableness is not required when the amount awarded is a nominal

amount." *Carver v. Halley*, 2d Dist. Greene No. 06CA54, 2007-Ohio-2351, ¶ 18. (Citation omitted.) Given the voluminous pleadings and three days of evidentiary hearings, the $350 that the trial court awarded is, indeed, nominal.

**{¶ 72}** As a final matter, we should note that in discussing Andrew's conduct, we do not excuse Julie's participation in actions that were not in the children's best interests. While Julie was not held in contempt for interfering with parenting rights during this round of contempt filings, she previously had been held in contempt twice. As we have stressed, using children as pawns in wars between embittered and divorced parents is a regrettable tragedy. *Harris*, 168 Ohio App.3d 1, 2006-Ohio-3649, 857 N.E.2d 1235, at ¶ 10. However, this tragedy can be prevented by parental cooperation and attention to the children's best interests.

**{¶ 73}** For the reasons discussed, the Second Assignment of Error is overruled.


V. Conclusion

**{¶ 74}** Both of Andrew's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.


Copies sent to:

Michael R. Eckhart
Michael Sheets
Hon. Timothy D. Wood