[Cite as *Myers v. Vitanovic*, 2022-Ohio-4802.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | | |
|---|---|---|---|
| JERALD MYERS, | : | | JUDGES: |
| | : | | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellant | : | | Hon. John W. Wise, J. |
| | : | | Hon. Craig R. Baldwin, J. |
| -vs- | : | | |
| | : | | |
| SUZANA VITANOVIC, | : | | Case No. 22 CAF 02 0009 |
| | : | | |
| Defendant - Appellee | : | | O P I N I O N |

CHARACTER OF PROCEEDING:              Appeal from the Delaware County
                                                                   Court of Common Pleas, Domestic
                                                                   Relations Division, Case No.
                                                                   13051366AD

JUDGMENT:                                              Affirmed

DATE OF JUDGMENT:                            December 29, 2022

APPEARANCES:

For Plaintiff-Appellant                              For Defendant-Appellee

JOHN H. COUSINS IV                            ELIZABETH R. WERNER
Grossman Law Offices                            The Nigh Law Group, LLC
32 W. Hoster Street, Suite 100               300 S. Second Street
Columbus, Ohio 43015                           Columbus, Ohio 43015

*Baldwin, J.*

{¶1} Plaintiff-appellant Jerold A. Myers appeals from the January 1, 2022 Judgment Entry of the Delaware County Court of Common Pleas, Domestic Relations Division.

STATEMENT OF THE FACTS AND CASE

{¶2} Plaintiff-appellant Jerold A. Myers and defendant-appellee Suzana Vitanovic are the parents of three minor children. The parties were never married but resided together for approximately 17 years until January of 2013.

{¶3} On May 28, 2013, appellant filed a Complaint to Establish the Father-Child Relationship with the minor children. On July 16, 2013, appellee filed an answer to the complaint. On July 17, 2013, appellee filed a motion seeking child support for the children. Appellant, on September 26, 2103, filed a Motion for Allocation of Parental Rights and Responsibilities. At the time, the children were 8, 6 and 4 years old.

{¶4} Pursuant to a Magistrate's Decision filed on October 29, 2013, appellant was found to be the natural father of the three children. On August 1, 2014, appellant filed a motion asking the trial court to adopt a shared parenting plan. An Agreed Entry-Shared Parenting Plan Decree was filed on November 20, 2014 that adopted the parties' Joint Shared Parenting Plan. The Plan and Decree required appellant to pay child support to appellee in the amount of $7,000.00 a month. Appellant's income for purposes of child support was set at $200,000.00 and appellees at $30,000.00. Pursuant to the Plan, the parties had an equal parenting time schedule.

{¶5} On October 7, 2015, appellant filed a Motion for Arrearage Determination of Child Support. Appellant, in his motion, argued that he did not have an arrearage but

was current in his child support obligation. On December 9, 2015, appellant filed an Emergency Motion to Reallocate Parental Right and Responsibilities. The Magistrate, in a Decision filed on December 28, 2015, determined that appellant was not in arrears in his child support. The Magistrate, in a Decision filed on January 20, 2016, modified the parties' Shared Parenting Plan. On August 3, 2016, the parties filed an Amended Joint Shared Parenting Plan that resolved many of the issues with the exception of certain financial issues, including child support. In January of 2017, the case was transferred from the juvenile court to the domestic relations court.

{¶6} A three day trial took place before a Magistrate during the months of February and July of 2017. In August of 2017, the parties entered into a new Amended Shared Parenting Plan that addressed all issues except child support and child-related financial issues. The Magistrate, in a Decision filed on November 9, 2017, concluded that appellant's total gross income was $325,524.95 and appellee's was $16,952.00. The Magistrate prepared two child support guideline worksheets, one showing appellant as the obligor and the other showing appellee as the obligor. Although appellant's guideline obligation would have been $3,060.00 per month, the Magistrate awarded him a downward deviation of $510.00, for a total of $2,550.00 per month in child support. The Magistrate also ordered appellant to maintain health care insurance for the children, to pay all school fees and expenses associated with one extra-curricular activity per quarter, and to pay all tutoring fees. Appellee filed objections, but they were later dismissed by the court on April 23, 2018 after she did not file a transcript of the hearing.

{¶7} On August 13, 2018, appellee filed a Motion to Modify the Shared Parenting Plan, seeking modifications as to parenting time, scheduling appointments and "other

changes that may be in the best interest of the minor children." The trial was originally scheduled for April of 2019. On June 25, 2019, Judge Spicer, who was sitting by assignment of the Supreme Court of Ohio, filed a notice announcing his voluntary withdrawal as the assigned Judge. On August 7, 2019, a Certificate of Assignment was filed indicating that the Honorable David E. Stucki was assigned. Pursuant to a Judgment Entry filed on October 11, 2019, the trial was scheduled for April 6th, 7th and 8th of 2020. However, on March 9, 2020, Ohio Governor Mike DeWine declared a state of emergency due to the COVID-19 pandemic. On March 27, 2020, the Governor of Ohio signed into law Am.Sub.H.B. No. 197, which immediately tolled, retroactive to March 9, 2020, all statutes of limitation, time limitations, and deadlines in the Ohio Revised Code and the Ohio Administrative Code until the expiration of Executive Order 2020-01D or July 30, 2020, whichever is sooner.

{¶8} The trial was rescheduled to October 5th and 6th of 2020. Appellant, on September 30, 2020, filed a motion seeking a continuance of the trial because the Guardian ad Litem's report had not been received by the deadline. The trial was later rescheduled on March 1st and 2nd of 2021. On March 1, 2021, the parties submitted stipulations and on the same date, the court issued an Agreed Interim Order. The Order provided that "child support shall be paid as ordered, not by applying futures to the current order."

{¶9} On July 16, 2021, the parties submitted an Agreed Amended Joint Shared Parenting Plan. The plan designated appellant the school placement parent for two of the children and appellee for the other child. The plan was adopted by the trial court on July

23, 2021.　As memorialized in an Agreed Judgment Entry filed on July 23, 2021, the trial was set for September 9, 2021.

{¶10} A two day trial was held on September 9th and 14th of 2021. At the conclusion of the trial, the parties agreed to submit proposed Judgment Entries with attached child support worksheets. Pursuant to a Judgment Entry filed on January 7, 2022, the trial court adopted and approved appellee's Proposed Judgment Entry. The trial court ordered appellant to pay child support in the amount of $6,600.00 a month ($2,200.00 a month per child) effective August 13, 2018 and to pay appellee $15,000.00 in attorney fees and court costs.

{¶11}　Appellant now raises the following assignments of error on appeal:

{¶12} "I.　THE TRIAL COURT ERRED, ABUSED ITS DISCRETION, AND RULED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN CALCULATING APPELLANT'S INCOME FOR THE PURPOSES OF CHILD SUPPORT."

{¶13} "II. THE TRIAL COURT ERRED, ABUSED ITS DISCRETION, AND RULED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BY REDESIGNATING THE OBLIGOR, FAILING TO APPLY THE PREEXISTING DOWNWARD DEVIATION, AND INSTEAD INCREASING APPEALLANT'S CHILD-SUPPORT OBLICATIONS BY 264%."

{¶14} "III.　THE TRIAL COURT ERRED AND ABUSTED ITS DISCRETION BY MAKING ITS $4,100 INCREASE OF CHILD SUPPORT RETROACTIVE TO OVER 40 MONTHS EARLIER WHEN (1) NO MOTION TO INCREASE CHILD SUPPORT WAS EVER FILED AND (2) THE 40-MONTH DELAY WAS DUE TO THE ASSIGNMENT OF A NEW JUDGE AND THE COVID-19 PANDEMIC."

**{¶15}** "IV.  THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY AWARDING $15,000 IN ATTORNY FEES AND LITIGATION EXPENSES."

**{¶16}**  As an initial matter, we note that appellant argues that the law of the case doctrine applies. According to appellant, he presented the exact same quantity and quality of evidence that he successfully presented in 2017 and the   law of the case doctrine required the trial court to follow its previous 2017 ruling.

**{¶17}**  The law-of-the-case doctrine "provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984). The doctrine includes a lower court's adherence to its own prior rulings or to the rulings of another judge or court in the same case. *Poluse v. Youngstown*, 135 Ohio App.3d 720, 725, 735 N.E.2d 505 (7th Dist.1999).

**{¶18}**  The doctrine's purpose is to ensure "consistency of results in a case, to avoid endless litigation by settling the issues, and to preserve the structure of superior and inferior courts as designed by the Ohio Constitution." *Nolan* at 3, 462 N.E.2d 410. It is a "rule of practice rather than a binding rule of substantive law and will not be applied so as to achieve unjust results." *Id.* The doctrine "should not be taken to imply that a trial court can never, under any circumstances, reconsider its prior ruling." *Poluse* at 725, 735 N.E.2d 505, quoting *Clymer v. Clymer*, 10th Dist. Franklin No. 95APF02–239, 1995 WL 571445 at 3 (Sept. 26, 1995).

**{¶19}**  We concur with appellee that , from 2017 to 2021, facts changed, there were different records with different deductions, and the trier of fact changed. We find that the trial court did not err in failing to apply the law of the case doctrine and was within its

discretion to review the facts and evidence submitted at the time of the hearing to determine appellant's income for purposes of child support.

I

**{¶20}** Appellant, in his first assignment of error, argues that the trial court erred, abused its discretion and ruled against the manifest weight of the evidence in calculating appellant's income for child support purposes.

**{¶21}** In *Marker v. Grimm*, the Ohio Supreme Court held that a child support computation worksheet must actually be completed and made a part of the trial court's record. 65 Ohio St.3d 139, 601 N.E.2d 496 (1992). This Court has held that the failure to include the worksheet in the record constitutes reversible error. *Bradley v. Hill*, 5th Dist. Delaware No. 19 CAF 10 0053, 2020-Ohio-2682. While *Marker* addressed the application of a statute that has since been repealed, the current version of the support guideline statute, R.C. 3119.022, continues to state that a standard worksheet form "shall be used in all courts and child support enforcement agencies when calculating child support * * *." R.C. 3119.022(A). Further, R.C. 3119.02 provides that when a court issues a child support order, the court "shall calculate the amount of the parents' child support * * * in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of Chapter 3119 of the Revised Code." See also *Clemens v. Clemens*, 5th Dist. Morgan No. 21AP0001, 2021-Ohio-3094.

**{¶22}** Compliance with the mandate of the Revised Code and *Marker* serves three purposes. First, the worksheet allows an appellate court to review the trial court's compliance with the statutorily mandated process for calculating child support. *Id.* at paragraph 50. Second, the worksheet supplies the data the trial court used to complete

the child support calculation, such as the amounts of each parent's gross annual income, the amounts of any income adjustments, and the amounts of any deviation adjustments. *Id.* The obligation to include the child support worksheet in the record insures that all aspects of the child support calculation are memorialized. *Id.* Finally, compliance with the Revised Code fulfills the court's duty "to act as the child's watchdog in the matter of support." *DePalmo v. DePalmo*, 78 Ohio St.3d 535, 1997-Ohio-184, 679 N.E.2d 266 (1997).

**{¶23}** Under the prior version of R.C. 3119.021, a combined income of more than $150,000 was outside of the scope of the basic child support schedule. A trial court was instructed to do as follows.

(B) If the combined gross income of both parents is greater than one hundred fifty thousand dollars per year, the court, with respect to a court child support order, or the child support enforcement agency, with respect to an administrative child support order, shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents. The court or agency shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic support schedule and applicable worksheet for a combined gross income of one hundred fifty thousand dollars, unless the court or agency determines that it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or oblige to order that amount. If the court or agency

makes such a determination, it shall enter in the journal the figure, determination, and findings.

**{¶24}** R.C. 3119.04(B) effective date 3-22-2001.

**{¶25}** As of March 28, 2019, this was changed so that the scope of the basic child support schedule was extended to $336,467.04. R.C. 3119.021 effective date 3-28-2019. If the parties' combined income is lower than the maximum amount, the trial court is required to use the standard worksheet form to calculate child support. R.C. 3119.022(A) effective March 28, 2019. R.C. 3119.04 was also amended to apply to only those cases where the combined parental income exceeds the amount set forth in R.C. 3119.021. R.C. 3119.04 effective date March 28, 2019. The law thus steers a trial court in setting child support levels for a child of higher income parents to make a calculation of the basic worksheet amount.

**{¶26}** In this case, there is no dispute that the parents' combined annual income exceeds $336,467.04 — the maximum annual income currently listed on the basic child support schedule established pursuant to R.C. 3119.021. In such cases, R.C. 3119.04 requires that the court determine the amount of an obligor's child support obligation on a case-by-case basis as follows:

> If the combined annual income of both parents is greater than the maximum annual income listed on the basic child support schedule established pursuant to section 3119.021 of the Revised Code, the court * * * shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the

parents. The court or agency shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic child support schedule and applicable worksheet for a combined annual income equal to the maximum annual income listed on the basic child support schedule established pursuant to section 3119.021 of the Revised Code, unless the court or agency determines that it would be unjust or inappropriate and therefore not in the best interest of the child, obligor, or obligee to order that amount. If the court * * * makes such a determination, it shall enter in the journal the figure, determination, and findings. * * *

**{¶27}** Appellant initially argues that the trial court erred by adding depreciation into his income and by not allowing ordinary and necessary expenses.

**{¶28}** Depreciation expenses associated with the production of income are properly deducted from the gross receipts of a self-employed support obligor. *Riggle v. Riggle*, Tusc. App. No. 2000AP030024 (Dec. 21,2000). However, the depreciation expenses are required to be shown on the company's books. *Id.* Where an item is actually purchased in one year with a cash expenditure, the depreciation should be allowed over a period of years pursuant to the depreciation schedule established by the internal revenue code.

**{¶29}** In the case sub judice, Jon Ryzenga, appellant's CPA, testified that appellant was depreciating several trucks and trailers and one forklift for his trucking Business, Pinewood Transportation. He testified that all of the items were used in the trucking business that appellant runs and that in the 2019 tax return, the total amount of

depreciation was $261,163.00. On appellant's 2018 tax return, he showed $104,000.00 in depreciation. The following testimony was adduced when Ryzenga was asked about that depreciation:

{¶30} Q.  Okay.  Okay.  Great.  Now, on line 20 on this form we see $104,000 in depreciation.

{¶31} A.  That's correct.

{¶32} Q.  Can you - - can you tell is about that depreciation?

{¶33} A.  Yeah.  The $104,000 of depreciation is what we were able to take on the assets that he had at the time.  And just looking quickly at the asset report it looks like we have some leasehold improvements and one Peterbilt truck, and there's a little depreciation on some other trucks that were purchased in '16 and '17, but no major purchases outside of some leaseholds and that one truck.  So not as much as you had in 2019.

{¶34} Q.  Okay.  But are those then vehicles that are used in the operation of the trucking company?

{¶35} A.  Yes, I believe so.

{¶36} Q. And trailers? I always forget the trailer part.

{¶37} A. Uh-huh.

{¶38} Trial Transcript at 24-25.

{¶39} On appellant's 2020 tax return, there was $255,000.00 in depreciation. Ryzenga testified as follows when asked what items he was depreciating.

{¶40} Q.   Now let's talk about depreciation on this particular return. For depreciation we have $255,000.

**{¶41}** A. Uh-huh.

**{¶42}** Q. Okay. What items are you depreciating in that situation?

**{¶43}** A. Well, in 2020 we have - - we have five trailers and a truck and some leasehold improvements. Those are being immediately expensed and that represents $184,930 of that total. The remainder of the depreciation is on items that were purchased earlier. Actually there is one other thing that's being depreciated currently. We do have 2019 Lexus.

**{¶44}** Q. And what's the depreciation on that?

**{¶45}** A. That would be $43,000.

**{¶46}** Q. Okay. Now, when you say other things that were depreciating that were purchased earlier, are those items that are used to earn the $2,973,000?

**{¶47}** A. As far as I know, yes. They were purchased in years prior to 2020.

**{¶48}** Q. Are they trucks and trailers?

**{¶49}** A. Yes.

**{¶50}** Q. Okay. And all that's under your depreciation and amortization schedule?

**{¶51}** A. Yes.

**{¶52}** Trial Transcript at 37-38.

**{¶53}** At the trial, appellant testified that the trucks and trailers that he was depreciating were used in his business. He testified that the trucks and trailers that he was depreciating in 2019 were on his schedule and were directly related to the earning of income for Pinewood Transportation, his business. Appellant testified that in 2017, he had ordinary expenses of $2,985,345.00 and that, of that, $63,070.00 was depreciation. He admitted that other than his tax returns, he had not introduced any other evidence to

support his depreciation. Appellant also testified that in 2019, he had total business income of $3,095,999.00 and $2,965,591.00 in ordinary and necessary business expenses. The latter figure included depreciation of $261,163.00.

{¶54} "Depreciation deductions on tax returns are, by themselves, insufficient evidence to show that money actually was expended as an ordinary and necessary business expense in the year the deduction was taken. *Huelskamp v. Huelskamp,* 185 Ohio App.3d 611, 2009–Ohio–6864, ¶ 45 (3d Dist.). This is in part because "in many cases, a company depreciates buildings and equipment that it owns solely for the purpose of reducing its income taxes." *Id.* at ¶ 42, citing *Foster v. Foster*, 150 Ohio App.3d 298, 2002-Ohio-6390, 780 N.E.2d 1041 at ¶ 23. Moreover, trial courts must be wary of " 'the possible manipulation of the numbers contained on the [tax] return to conceal income which, as a practical matter, may be available for child support purposes.' "*In re Custody of Harris,* 168 Ohio App.3d 1, 2006–Ohio–3649, ¶ 50 (2d Dist.), quoting *Offenberg v. Offenberg,* 8th Dist. Cuyahoga Nos. 78885, 78886, 79425, and 79426, 2003–Ohio–269, ¶ 30. Accordingly, a parent claiming ordinary and necessary expenses for business equipment must present evidence demonstrating those purchases beyond the tax return itself. *Neu v. Neu,* 3d Dist. Putnam No. 12–12–11, 2013–Ohio–221, ¶ 19; *In re K.P.,* 2d Dist. Clark No.2011–CA–68, 2012–Ohio–1094, ¶ 19–20. This evidence may include, among other things, business records and backup documentation explaining how the depreciation deduction was calculated, and what it represents. *See Huelskamp* at ¶ 45.

{¶55} "It was Father's burden, as the party claiming the business expense, to provide "suitable documentation to establish the expense." *Id.* at ¶ 43, quoting *Ockunzzi*

*v. Ockunzzi,* 8th Dist. Cuyahoga No. 86785, 2006–Ohio–5741, ¶ 53" *In re B.P.,* 2015-Ohio-4352, ¶¶ 12-13.

**{¶56}** As noted by the trial court, appellant did not provide any records beyond his tax returns to prove that any of the depreciation is appropriate to reduce his income. He admitted that other than his tax returns, he had not introduced any other evidence to support his depreciation. We find, therefore, that appellant has failed to meet his burden of demonstrating that the depreciation was appropriate.

**{¶57}** Appellant also argues that the trial court abused its discretion when it included nonrecurring COVID-19 financial assistance in determining his income. Appellant argues that pursuant to R.C. 3119.01(C)(13), nonrecurring or unsustainable income or cash flow items are not considered income for the purposes of child support. Nonrecurring income is income the parent receives in any year or for any numbers of years not to exceed three years that the parent does not expect to continue to receive on a regular basis. *See* R.C. 3119.01(C)(13). Appellant specifically contends that BWC Covid-19 dividends were  non-recurring income and should not have been included.

**{¶58}** At the trial in this matter, there was testimony that appellant received a refund from the Bureau of Workers' Compensation (BWC) in 2019 for $87,781.00 and that he received a BWC reimbursement in 2020 for $258,061.00. The following is an excerpt from the testimony of his CPA:

**{¶59}** Q. Now, do you presume that he will receive that in 2021?

**{¶60}** A. I do not.

**{¶61}** Q.  Why do you think that will change?

**{¶62}** A. I think it will change based on the fact that the 2020 number is typically a lot higher because of the pandemic that we were all going through. I noticed larger refunds for all of my clients across the board, and being that things have settled down to a degree, I hesitate to say that given what's going on currently, but assuming that things settle down, we should not see large BWC refunds of this nature, and to my knowledge, none of my clients have informed me that they have received any checks from BWC in 2021.

**{¶63}** Transcript at 15-16. He further testified that in 2018, appellant's business received a BWC payment of $19,200.00 which was a more typical amount. According to Ryzenga, "the past two years we've obviously seen BWC refunds that have been quite a lot larger, but would say this is more typical, yes." Trial Transcript at 22. When asked, he testified that he was not capable of predicting what a refund might be for any given year.

**{¶64}** On cross-examination, Ryzenga testified that there had been a BWC refund for the last three years. The following is an excerpt from his testimony at trial:

**{¶65}** Q. Okay. So I'd like to start with the BWC refunds. Is it accurate that for the last three years there has been a BWC refund?

**{¶66}** A. That is correct.

**{¶67}** Q. And so if you average the three years, those were always - - excuse me. Every single BWC refund was for payments that were previously made to BWC?

**{¶68}** A. I - -

**{¶69}** Q. In other words, no refund unless you paid it before?

**{¶70}** A. Yes. That would be correct. You don't get a refund unless you pay something to BWC.

**{¶71}** Q. And there's no way for you to identify what year the refunds were related to, whether he got it in '18 for '17, if it was in '19, was it for '18, you can't track that information?

**{¶72}** A. I don't get that information.

**{¶73}** Q. Does anyone get that information?

**{¶74}** A. It's possible that Jerry [appellant] may get that information because when the check is cut, there may be some documentation relating to how it was computed.

**{¶75}** Q. In you experience does it typically occur - - do you get a refund from 10 years ago or do you get a refund from the last couple of years of payments?

**{¶76}** A. The refund would normally be related to a period that's right after the refund's paid. So it would probably be for the prior year. It could be for a prior quarter or prior half year, but it's not something that you would get for something 10 years prior, no.

**{¶77}** Q. So when there's 200-some-thousand dollars that was reflected on Jerry's tax returns - -  I'm sorry, Pinewood's tax returns that showed BWC refund of over $200,000, that $200,000 was paid likely the year prior to BWC?

**{¶78}** MR. HERZOG: Objection.  Objection. Speculating. I don't think that he knows that and I don't think we've established that he does.

**{¶79}** THE COURT: Well, he may not speculate, but he is I guess an expert of sorts and I want to give him the full opportunity for cross-examination so I'll let the question be answered, but again no witness really can speculate.

Go ahead.

**{¶80}** A.  What I'm saying is that - -  what I would say is the refunds relate back to the prior year.  Now, I will say the 2020 refunds were abnormally large so it's possible

that there may have been some different methodology at the BWC to pay those amounts, but if we look back at the '19 and the '18 refunds, yes, I could say with pretty good confidence that those are related to BWC payments made in the prior year.

**{¶81}** Q. And when a person or company pays BWC, that is reflected in their tax returns for that year as a deduction of the gross - -  company gross income, correct?

**{¶82}** A.  That is correct.

**{¶83}** Q.   So if Jerry received $200,000 even the year he received 40-some-thousand dollars from BWC, that would have been a deduction from a prior year reducing this income? I apologize, when I say Jerry, I mean Pinewood.

**{¶84}** A. Yeah. Yeah. If we have a BWC refund, it stands to reason that we deducted some BWC payments as an expense in a prior year.  Since we've deducted the expense, any refunds are then taxable.

**{¶85}** Q. So if we average three years, that would generally adjust for any fluctuation year to year, or if we just look at the net income - - or the gross income of every year and did - -  that it does - -  let me try this again. On more time.

If we do the adjusted gross income, which is the gross income minus the ordinary and necessary business expenses that would include BWC, by averaging the incomes, that does also average out those payment that were paid to BWC?

**{¶86}** A. It could, I mean, if you're - - I'm not exactly sure what you're driving at.

**{¶87}** Transcript at 52-55. Ryzenga further tested that there was no dollar-for-dollar payment from the BWC but that "you cannot receive a BWC refund if you've never paid any BWC." Transcript at 91. He admitted that appellant did not pay $250,00.00 in 2019 that he then received in 2020.

**{¶88}** At trial, appellant testified that he received a total of almost $400,000.00 in BWC refunds in two years due to COVID-19. While he received the biggest check in December of 2020, he testified that he had not received any BWC payments in 2021 and did not expect any.

**{¶89}** We find that there was testimony that the BWC reimbursement had occurred for more than three years and that it was expected that appellant would continue to receive such reimbursement, although the amount was unknown. We find that the trial court did not abuse its discretion in averaging the BWC reimbursements in determining appellant's income.

**{¶90}** Appellant's first assignment of error is, therefore, overruled.

II

**{¶91}** Appellant, in his second assignment of error, argues that the trial court erred, abused its discretion, and ruled against the manifest weight of the evidence by redesignating the obligor, failing to apply the preexisting downward deviation, and instead increasing appellant's child support obligation by 264%.

**{¶92}** Pursuant to R.C. 3119.22, a trial court may deviate from the standard child support order if, after considering the factors and criteria set forth in R.C. 3119.23, such an order would be unjust or inappropriate and would not be in the best interest of the children. *Brown v. Brown,* 12th Dist. Butler No. CA2014–09–184, 2015-Ohio-1930, 2015 WL 2452047, ¶ 7. In determining if a deviation is in the best interest of the children, R.C. 3119.23 sets forth a number of factors the court may consider. *Id.* A trial court's decision regarding whether to order a deviation from the child support guidelines is reviewed for an abuse of discretion. *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989).

An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶93} R.C. 3119.23 states as follows:

{¶94} The court may consider any of the following factors in determining whether to grant a deviation pursuant to section 3119.22 of the Revised Code:

{¶95} (A) Special and unusual needs of the child or children, including needs arising from the physical or psychological condition of the child or children;

{¶96} (B) Other court-ordered payments;

{¶97} (C) Extended parenting time or extraordinary costs associated with parenting time, including extraordinary travel expenses when exchanging the child or children for parenting time;

{¶98} (D) The financial resources and the earning ability of the child or children;

{¶99} (E) The relative financial resources, including the disparity in income between parties or households, other assets, and the needs of each parent;

{¶100} (F) The obligee's income, if the obligee's annual income is equal to or less than one hundred per cent of the federal poverty level;

{¶101} (G) Benefits that either parent receives from remarriage or sharing living expenses with another person;

{¶102} (H) The amount of federal, state, and local taxes actually paid or estimated to be paid by a parent or both of the parents;

{¶103} (I) Significant in-kind contributions from a parent, including, but not limited to, direct payment for lessons, sports equipment, schooling, or clothing;

**{¶104}**        (J) Extraordinary work-related expenses incurred by either parent;

**{¶105}**        (K) The standard of living and circumstances of each parent and the standard of living the child would have enjoyed had the marriage continued or had the parents been married;

**{¶106}**        (L) The educational opportunities that would have been available to the child had the circumstances requiring a child support order not arisen;

**{¶107}**        (M) The responsibility of each parent for the support of others, including support of a child or children with disabilities who are not subject to the support order;

**{¶108}**        (N) Post-secondary educational expenses paid for by a parent for the parent's own child or children, regardless of whether the child or children are emancipated;

**{¶109}**        (O) Costs incurred or reasonably anticipated to be incurred by the parents in compliance with court-ordered reunification efforts in child abuse, neglect, or dependency cases;

**{¶110}**        (P) Extraordinary child care costs required for the child or children that exceed the maximum state-wide average cost estimate as described in division (P)(1)(d) of section 3119.05 of the Revised Code, including extraordinary costs associated with caring for a child or children with specialized physical, psychological, or educational needs;

**{¶111}**        (Q) Any other relevant factor.

**{¶112}**        The trial court, in the case sub judice, in its Judgment Entry, went through the factors set forth in R.C. 3119.23 in detail on pages 12 through 17. The trial

court noted that the parties' oldest child had mental health issues and had not had regular or consistent contact with appellant since 2020. The court further noted that appellee had to pay medical expenses for the child and that appellee "had been charged with the day-to-day costs and has had to pay for expenses above and beyond what was initial (sic) contemplated with the child support order." The trial court also noted that appellant had not had an overnight visit with the child for nearly a year and hat this status was not likely to change. Appellant, the court indicated, had other adults in his home that were a benefit to him financially and also with respect to the care of the children.

**{¶113}**     The trial court further noted that while appellant was required to pay all uncovered medical costs, tutoring costs, school fees and extracurricular fees, that these fees were nominal compared to appellant's household income. There was testimony that appellee's costs exceeded appellants. While the parties had equal parenting time with two of the children, as is stated above, appellant had not had an overnight visit with one of the children for nearly a year. The trial court further pointed out that there was a clear disparity in income between the parties and that before the payment of child support, appellee earned approximately 7% of the parties' combined total income while appellant earned 93%. According to the trial court, appellee lived in her home with the children and no one else contributed to her living expenses while appellant lived with his wife and her children and shared expenses with his wile who earned between $50,000.00 and $60,000.00 per year. This exceeded appellee's total household income. While appellant had significant financial resources, appellee testified that she had no additional financial resources and relied on the payment of support to meet her basic

financial needs. The trial court noted that while appellee struggled to maintain a home in the same school district, appellee had a "comfortable, if not luxurious lifestyle."

{¶114}    Based on the foregoing, and on other factors set forth in the trial court's decision, we find that the trial court did not err in redesignating the obligor, finding that a deviation below the child support obligation guideline was not appropriate, and in increasing appellant's child support obligation.

{¶115}    Appellant's second assignment of error is, therefore, overruled.

III

{¶116}    Appellant, in his third assignment of error, argues that the trial court erred an abused its discretion by making the increase in child support retroactive to August 13, 2018.

{¶117}    R.C. 3119.84 allows the court to "modify an obligor's duty to pay a support payment that becomes due after notice of a petition to modify the court support order has been given to each obligee and to the obligor before a final order concerning the petition for modification is entered." This has been interpreted to "plainly state[ ] that a court may retroactively modify a child-support payment that became due after the obligee of the order had notice of the petition to modify the support order." *Byrd v. Knuckles*, 120 Ohio St.3d 428, 2008–Ohio–6318, ¶4. *See also Phelps v. Saffian*, 8th Dist. Cuyahoga No. 103549, 2016-Ohio-5514, ¶55. As with other child support issues, we review the court's decision to order retroactive modification of child support for an abuse of discretion. *Davis v. Dawson,* 8th Dist. Cuyahoga No. 87670, 2006–Ohio–4260, ¶ 7.

{¶118}    In *McNeeley v. Ortiz,* 5th Dist. Stark No.2010–CA–00012, 2010–Ohio–4650, ¶ 22, this court stated: "Generally, trial courts may make orders altering child

support effective as of the date the opposing party had notice of the request ordered child support. *Waco v. Waco* (March 8, 1999), Stark App. No.1998–CA–00279."

{¶119}     In the case sub judice, appellee filed a Motion to Modify Parental Rights and Responsibilities on August 13, 2018. While appellee, in her motion, did not expressly ask for a modification of child support, she asked for "any other changes that may be in the best interest of the minor children." We find, therefore, that the trial court did not err in finding that the Motion to Modify requested a modification of child support and using the August 13, 2018 date.

{¶120}     Appellant's third assignment of error is, therefore, overruled.

IV

{¶121}     Appellant, in his fourth assignment of error, argues that the trial court erred and abused its discretion by awarding $15,000.00 in attorney fees and litigation expenses to appellee.

{¶122}     An award of attorney's fees lies within the sound discretion of the trial court. *Rand v. Rand,* 18 Ohio St.3d 356, 359, 481 N.E.2d 609 (1985). It is well-established that an abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). It is within the trial court's authority to order the noncustodial parent to pay the custodial parent a reasonable amount for attorney fees incurred in post-decree modification proceedings relative to the support of the minor children. *Cohen v. Cohen*, 8 Ohio App.3d 109, 456 N.E.2d 581 (1983).

*{¶123}*      In evaluating the reasonableness of the request for attorney fees, the trial court must balance several factors to determine to what extent, if any, an award of attorney fees is warranted. The factors to be considered include the needs of the children, the change in circumstances including increases in income, the assets of the parties, the ability or inability of each party to pay attorney fees, the degree of increase in child support awarded, the total amount of the attorney fees, the proportion of attorney fees caused by undue delay or resistance by either party in resolving the child-support issue, and the effect of payment of attorney fees upon the custodial parent's ability to contribute a proportionate share of child support. See *Cohen, supra.*

**{¶124}**      The trial court, in the case sub judice, stated in relevant part in awarding attorney fees to appellee**:**

**{¶125}**      "As noted before, this case has been tumultuous, long, and difficult for both parties.  There have been significant delays, many of them not related to the parties.  Nevertheless, Plaintiff [appellant] has taken actions during the pendency of this action that warrant an award of attorney fees.  Some examples include the issues with discovery that resulted in an order compelling response and a preservation of allocation of fees.  Father also filed a Motion to Escrow Child Support, which was denied, but them(SIC) he arbitrarily withheld the monthly obligation because he was "overpaid." He circumvented the Court's denial.  This happened because he was the one in control of how the employer withheld support.  He took this action despite knowing how important the support was to the budge of the defendant's household.

**{¶126}**      "The issues that caused delay also do not change the fact there is a significant difference of income.  It is not just or appropriate for a parent to be successful

in a request to modify support only to have that support be paid to counsel needed to precure the fees.

**{¶127}**          "Defendant [appellee] testified that she has incurred more than $30,334.50 in the three years of litigation and $141.40 in expenses.  This did not include time at court or fees anticipated in the preparation of the closing/proposed brief.  The amount that Defendant has incurred and paid is nearly equal to Defendant income for a year.

**{¶128}**          "Plaintiff did not provide any evidence regarding the attorney fees, other than records that showed some of the fees were paid by Pinewood Transportation."

**{¶129}**          "When considering the factors of an award of attorney fees, it is just and appropriate to award Defendant $15,000 in attorney fees and costs, to be paid by the Plaintiff on or before November 15, 2021."

**{¶130}**          We find that the trial court's decision was not arbitrary, unconscionable or unreasonable.

**{¶131}**          Appellant's fourth assignment of error is, therefore, overruled.

**{¶132}** Accordingly, the judgment of the Delaware County Court of Common Pleas, Domestic Relations Division, is affirmed.

By: Baldwin, J.

Hoffman, P.J. and

Wise, John, J. concur.